# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Pink Cheetah Express LLC** | ) | **VERIFIED COMPLAINT FOR** |
| **1775 I. Street NW, Ste 1150** | ) | **DECLARATORY RELIEF** |
| **Washington, DC 20006** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Total Quality Logistics LLC** | ) | |
| **4289 Ivy Points Blvd.** | ) | **28 U.S.C. 2201** |
| **Cincinnati, OH 205900** | ) | |
| | ) | |
| **Defendant** | ) | |

**SERVE:**

**Shawn Coulson, LLP**
**1320 19th St., NW Suite 601**
**Washington, DC 20036**

### VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Pink Cheetah Express LLC, ("Plaintiff"), through its owner, Dakota Springfields, by and

through the undersigned Counsel, files this Complaint for declaratory and injunctive relief

against Total Quality Logistics LLC ("Defendant,") for its failure to comply with an <u>Order</u> of the

Secretary of Transportation issued pursuant to 49 USC §14701 and hereby alleges the following:

### JURISDICTION & VENUE

2.      This action arises under the private right of action afforded to Plaintiff by 49 USC

§14704[1] involving transportation of regulated commodities in interstate commerce.  This Court

therefore has subject matter over this action because it is a cause concerning a Federal question

---

[1] "(a)In General.— (1)Enforcement of order.— A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection."

arising under Federal law. In addition, this Court has the authority to issue declaratory relief sought pursuant to 28 U.S.C. §2201.

3.      This is an action by a Plaintiff regulated by the United States Department of Transportation (USDOT) with offices in the District of Columbia. Defendant is based in Ohio, is also regulated by USDOT, and is required as a condition of Federal licensure to maintain agents of process nationwide, including in the District of Columbia. Therefore, venue is proper in this Court under 28 U.S.C. §1391(e).

## STANDING

4.      The Plaintiff has standing to bring this action because it was injured as a result of the Defendant's failure to obey an order given to them by the USDOT pursuant to 49 USC §14704, predicated on Plaintiff's regulatory right to inspect records under 49 C.F.R. 371.3.

## THE PARTIES

5.      Plaintiff Pink Cheetah Express LLC is a District of Columbia-domiciled motor carrier duly-registered with the USDOT's Federal Motor Carrier Safety Administration (FMCSA) under USDOT Safety Tracking Number 3284151. At the time of doing business with the Defendant, Plaintiff held interstate motor carrier operating authority from FMCSA under MC Docket Number 1038832, which is a license issued by FMCSA to do business as a for-hire motor carrier of regulated commodities in interstate commerce. Currently, Plaintiff is fit, willing, and able to operate as a private carrier, a for-hire carrier of exempt commodities, and a for-hire motor carrier of regulated commodities operating purely in intrastate commerce; that is, solely within states such as Florida that do not require operating authority, pursuant to its intrastate USDOT Number adopted by such states.

6.    Defendant Total Quality Logistics LLC (commonly referred to as "TQL") is the second

largest property broker (commonly referred to as a "freight broker") in the United States, based

in Ohio, and is Federally-licensed by the FMCSA to arrange for interstate motor carrier

transportation of regulated commodities as a third-party surface transportation intermediary

under MC Docket Number 322572.

## FACTUAL ALLEGATIONS

7.    On or about January 18, 2023, Plaintiff contracted with Defendant on the "spot market"

to haul one interstate truck load of ice cream (**Exhibit A**). After the load was hauled, Plaintiff

filed a request to inspect Defendant's transactional records required to be kept by Defendant

under 49 C.F.R. 371.3, including records between the Defendant and the Plaintiff and the

Defendant and its shipper client pursuant to Plaintiff's regulatory rights to rate transparency

under 49 CFR 371.3 [2]. Defendant refused to release said records on the basis that Defendant's

---

[2] 49 C.F.R. 371.3 states: "A broker shall keep a record of each transaction. For purposes of this section, brokers may keep master lists of consignors and the address and registration number of the carrier, rather than repeating this information for each transaction. The record shall show:

   (1) The name and address of the consignor;

   (2) The name, address, and registration number of the originating motor carrier;

   (3) The bill of lading or freight bill number;

   (4) The amount of compensation received by the broker for the brokerage service performed and the name of the payer;

   (5) A description of any non-brokerage service performed in connection with each shipment or other activity, the amount of compensation received for the service, and the name of the payer; and

   (6) The amount of any freight charges collected by the broker and the date of payment to the carrier.

  (b) Brokers shall keep the records required by this section for a period of three years.

standard spot market contract requires motor carriers such as Plaintiff to waive their rights under 49 CFR 371.3(c), which states in relevant part: "Each party to a brokered transaction has the right to review the record of the transaction required to be kept under these rules."

8.      Defendant does not have the right to deregulate itself in contracts because there is no Federal law that permits property brokers and motor carriers to waive Federal regulations. Plaintiff maintained after the load was hauled that the contractual waiver the Defendant coerces carriers to agree to as a condition to receive loads constituted unlawful evasion of regulation by Defendant under 49 USC §14906[3], and the waiver was void and unenforceable under the Sherman Antitrust Act as a matter of unreasonable restraint of trade (15 USC §1). Plaintiff, through its owner, Dakota Springfields, filed a complaint with the Secretary of Transportation on October 31, 2023 (**Exhibit B**) pursuant to 49 USC §14701 requesting enforcement of 49 CFR 371.3, retrieval of the requested records by the Secretary or his designee, and an order from USDOT directing Defendant to cease and desist from evading regulation through waiver of 49 CFR 371.3 in its contracts and failing to respect all motor carriers' regulatory rights to request inspection of transactional records in the future under 49 CFR 371.3 .

9 .      Plaintiff's principal learned that FMCSA had approved in March of 2023 a rulemaking to strengthen motor carriers' broker rate transparency rights under 49 CFR 371.3 through two petitions for rulemaking filed in May of 2020 by two separate trade associations, and that

---

(c) Each party to a brokered transaction has the right to review the record of the transaction required to be kept by these rules.

[3] "A person, or an officer, employee, or agent of that person, that by any means tries to evade regulation provided under this part for carriers or brokers is liable to the United States for a civil penalty of at least $2,000 for the first violation and at least $5,000 for a subsequent violation, and may be subject to criminal penalties."

FMCSA had previously issued a letter to one of these associations one year prior on March 1, 2022, stating 49 C.F.R. 371.3 was still in full force and effect and brokers were obligated to comply with the regulation in the interim during the pendency of the rulemaking (**Exhibit C**).

10.       Thereafter, the Secretary-- through his duly appointed FMCSA designee, commenced the investigation requested by the Plaintiff pursuant to 49 USC §14701[4], and demanded the records from the Defendant pursuant to USDOT's own authority to inspect same under 49 USC §521[5].

11.       The Secretary is authorized by law to prescribe the form of any required records prepared or compiled by brokers, including those related to movement of traffic and receipts and

---

[4] "(a)Investigations.—
The Secretary or the Board, as applicable, may begin an investigation under this part on the Secretary's or the Board's own initiative or on complaint. If the Secretary or Board, as applicable, finds that a carrier or broker is violating this part, the Secretary or Board, as applicable, shall take appropriate action to compel compliance with this part. If the Secretary finds that a foreign motor carrier or foreign motor private carrier is violating chapter 139, the Secretary shall take appropriate action to compel compliance with that chapter. The Secretary or Board, as applicable, may take action under this subsection only after giving the carrier or broker notice of the investigation and an opportunity for a proceeding.
(b)Complaints.—
A person, including a governmental authority, may file with the Secretary or Board, as applicable, a complaint about a violation of this part by a carrier providing, or broker for, transportation or service subject to jurisdiction under this part or a foreign motor carrier or foreign motor private carrier providing transportation registered under section 13902 of this title. The complaint must state the facts that are the subject of the violation. The Secretary or Board, as applicable, may dismiss a complaint that it determines does not state reasonable grounds for investigation and action."
[5] "(a)Investigations.—
The Secretary or the Board, as applicable, may begin an investigation under this part on the Secretary's or the Board's own initiative or on complaint. If the Secretary or Board, as applicable, finds that a carrier or broker is violating this part, the Secretary or Board, as applicable, shall take appropriate action to compel compliance with this part. If the Secretary finds that a foreign motor carrier or foreign motor private carrier is violating chapter 139, the Secretary shall take appropriate action to compel compliance with that chapter. The Secretary or Board, as applicable, may take action under this subsection only after giving the carrier or broker notice of the investigation and an opportunity for a proceeding.
(b)Complaints.—
A person, including a governmental authority, may file with the Secretary or Board, as applicable, a complaint about a violation of this part by a carrier providing, or broker for, transportation or service subject to jurisdiction under this part or a foreign motor carrier or foreign motor private carrier providing transportation registered under section 13902 of this title. The complaint must state the facts that are the subject of the violation. The Secretary or Board, as applicable, may dismiss a complaint that it determines does not state reasonable grounds for investigation and action."

expenditures of money, and the time period for preservation of such records (49 USC §14122). He has done so by promulgating 49 CFR Part 371.

12.    Furthermore, under 49 USC §13904(e), the Secretary is directed that regulations applicable to brokers "shall provide for the protection of motor carriers and shippers by motor vehicle." 49 CFR 371.3 is one such regulation that protects motor carriers and shippers by declaring transparency rights to review brokers' records.

13.    On November 29, 2023, FMCSA Transportation Specialist Nelson Newcomb called Plaintiff's principal, Dakota Springfields, and told her the Defendant was refusing to turn over the requested documentation to USDOT until they talk with their legal department and the FMCSA Ohio Field Office would be paying a visit to Plaintiff's office the following day to seize the records if they didn't respond.

14.    On November 30, 2023, Defendant complied with the FMCSA's request and produced the records to FMCSA. It is unclear if the planned visit took place. Nelson Newcomb provided Dakota Springfields with the records she had originally requested from Defendant. Despite statistics from the brokerage industry that purport that the average broker "margin" is 14-16%, the records revealed that Plaintiff received from the broker only 56% of the payment for the load in question (PO #23197637) in terms of what the shipper paid as a freight rate to the broker.

15.    At the conclusion of the FMCSA's investigation, the FMCSA issued an order[6] (**Exhibit D**) to the Defendant on November 30, 2023, in accordance with complainant's specific request in the complaint, directing the Defendant to remove the waiver language from its contracts because

---

[6] Under 5 U.S. Code § 551(6), "an "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing(.)"

it may violate the evasion of regulation statute (49 U.S. Code § 14906), and to comply with future 49 CFR 371.3 records inspection requests from any motor carriers who haul for the Defendant. It is the Plaintiff's belief that the Defendant has not complied with the order in general by removing the contract waiver clause or cooperating with other carriers' requests to inspect records.

16.    On December 3, 2023, after FMCSA issued and the Defendant had received the November 30, 2023 order, Plaintiff contacted Defendant again and requested to inspect the transactional records on an additional 15 loads Plaintiff carried for Defendant over the past three years in furtherance of collecting evidence to be used to sue the Defendant. Defendant rejected the request, thus clearly violating the Secretary's order. Defendant is therefore damaging Plaintiff because it is interfering with her lawful right to litigate against Defendant.

17.    On December 6, 2023, Plaintiff sent an email to Nelson Newcomb that she made a request to TQL for broker transparency on an additional 15 loads she hauled and Plaintiff once again requested FMCSA's assistance in retrieving the documents as they are an addendum to the original request for assistance from USDOT and complaint the Plaintiff previously filed with the Secretary against Defendant.

18.    On December 7, 2023, Plaintiff's owner, Dakota Springfields sent an email to the National Consumer Complaint Database ("NCCDB") to update her previously-filed complaint number 10245033 against TQL. Plaintiff made the following notation:

"Pursuant to FMCSA's previous action on my complaint against TQL in the matter of complaint number 10245033, I request you also order this broker to comply with 371.3 and or seize and furnish me with shipper broker records on this load. Insofar as my complaints in part involve

alleged deceptive business practices I request you refer that part of the complaint to the Federal Trade Commission."

19.    On or about December 8, 2023, Defendant blocked Plaintiff from all communication which prevented Plaintiff from further communicating and following-up on transparency requests.

20.    It appears the FMCSA's position is that the FMCSA has already compelled compliance of 49 CFR 371.3 in one instance on behalf of Plaintiff and that the Plaintiff now has the authority to enforce the FMCSA's November 30, 2023 order against the Defendant through this private right of action to protect its rights.

21.    As of the filing of this complaint, the Plaintiff has not received any information regarding her broker transparency requests aside from the initial document that was turned over on November 30, 2023, even though she has made several good-faith requests to Defendant and to the FMCSA. Defendant has knowingly and intentionally violated the regulations, the law, and the FMCSA's order and arrogantly takes the position it is above the law. This must not be allowed to continue to happen with impunity.

22.    While brokers have generally argued that they may lawfully waive regulations under 49 USC 14101(b) because brokers are purportedly shippers, FMCSA in a recent rulemaking (Docket No. FMCSA-2023-0257; RIN 2126-AC63) has rejected this notion:

"The Agency's exercise of authority to regulate broker recordkeeping, including its issuance of broker transparency regulations, is not in conflict with 49 U.S.C. 14101(b). That statute permits shippers and carriers to waive certain rights and remedies by contract, but for reasons discussed in section VI.B.8. of this NPRM, the Agency believes brokers are not shippers within the

meaning set out by 49 U.S.C. 14101(b). Because the statute does not relate to brokers, it does not conflict with the Agency's broker transparency regulations. Congress has also expressed its clear intent in 49 U.S.C. 13904(e) for the Agency to issue regulations applicable to brokers that provide protection for shippers and motor carriers, consistent with the Agency's responsibility to carry out the objectives of the national transportation policy and its general authority to regulate brokers of property."

23.    As the FMCSA further points out in that current rulemaking:
"Moreover, a regulated entity must adhere to the regulations and cannot "disguise its regulatory obligations as contractual ones." Taylor Energy Co. LLC v. United States, 975 F.3d 1303, 1306 (Fed. Cir. 2020)."

24.    Upon information and belief, it is Plaintiff's understanding that Defendant has not complied with the order in that it has not removed the waiver language from its contracts as directed by FMCSA in the order, it does not respect 49 CFR 371.3 transparency rights, and it continues to violate the order on a daily basis with respect to new motor carriers with whom the Defendant does business by including the unlawful waiver in order to deregulate itself and exploit motor carriers in need of loads to haul.

## FIRST CLAIM FOR RELIEF

25.    Plaintiff Pink Cheetah Express, LLC has a statutory right under 49 USC §14704 to seek enforcement of an order by the Secretary issued upon complaint pursuant to 49 USC §14701 and to inspect Defendant's records directly pursuant to 49 CFR 371.3 cited in the order.

26.    49 C.F.R. 371.3 requires a broker to keep records relating to transactions between a broker and any carrier, including, but not limited to the amount of compensation received by the

broker for the brokerage service performed and the name of the payer. 49 CFR 371.3(c) specifically states that each party to a brokered transaction has the right to review the record of the transaction required to be kept by these rules.

27.    Plaintiff Pink Cheetah Express, LLC requests this Honorable Court order the Defendant to turn over to the Plaintiff all records, in an unredacted format, of any transaction that has taken place between the Plaintiff and the Defendant, including but not limited to all of the 14 transactions that the Plaintiff previously requested pursuant to the Secretary's November 30, 2023 order, as well as any documentation, in unredacted form, between the Defendant and their original shipper client for all loads that were the subject of the 14 transactions as described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, through its owner, Dakota Springfields requests that this Court:

(a) Order the Defendant to turn over to the Plaintiff all records, in an unredacted format, of any transaction that has taken place between the Plaintiff and the Defendant, including but not limited to all of the 14 transactions that the Plaintiff previously requested pursuant to the Secretary's November 30, 2023 order, as well as any documentation, in unredacted form, between the Defendant and their original shipper client for all loads that were the subject of the 14 transactions as described above.

(b) Order the Defendant to obey the Secretary's order of November 30, 2023 and remove the following language from its contracts:

> "BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3."

10

(c) Order the Defendant to comply with the FMCSA's order of November 30, 2023 in all

respects in all future transactions for all motor carriers.

(d) Award costs and attorney fees associated with filing this complaint.

(e) Order any other relief the Court deems just and proper.

## VERIFICATION

I, Dakota Springfields, as the owner of Plaintiff Pink Cheetah Express, LLC hereby

verify and affirm under the penalty of perjury, that the statements contained herein are true and

correct to the best of my knowledge, information, and belief.

Date: 2/24/25

Dakota Springfields

February 24, 2025

Respectfully submitted,

/s/ Laurence L. Socci
Laurence L. Socci, Esq.
D.C. Bar No. 241318
The Socci Law Firm
P.O. Box 14051
Washington, DC 20044
(202) 262-5843
laurence.socci@soccilawfirm.com
Counsel for Plaintiff

# TQL

**TOTAL QUALITY LOGISTICS**

**TQL RATE CONFIRMATION FOR PO# 23197637**

FIND YOUR NEXT LOAD BY VISITING
CARRIERDASHBOARD.TQL.COM

**EXHIBIT A**

TO ENSURE PROMPT PAYMENT, SUBMIT THIS RATE CONFIRMATION, COMPLETE BOL(S)/POD, RECEIPTS AND OTHER APPLICABLE PAPERWORK WITHIN 24 HOURS OF DELIVERY TO CINVOICES@TQL.COM. FOR OTHER OPTIONS, SEE NEXT PAGE.

## TQL CONTACT INFO

| Name | Phone | Email | Fax |
|---|---|---|---|
| Ryan Steadly | 800-580-3101 x52016 | teamsteadly@tql.com | 5135228376 |

## CARRIER CONTACT

*Office Staffed 24/7*

| MC#/DOT# | Name | Phone | Terms | Fax |
|---|---|---|---|---|
| 1038832 / 3284151 | Pink Cheetah Express Llc (fl) | 347-494-2356 | 28DAYS | 347-494-2356 |

| Address |
|---|
| APEX CAPITAL CORP P.O. BOX 961029  FT. WORTH, TX 76161-1029 |

| Dispatcher | Driver | Truck # | Trailer # |
|---|---|---|---|
| Dakota | Dakota | 69 | 673 |

## LOAD INFORMATION

| Rate | Type | Unit | Quantity | Total |
|---|---|---|---|---|
| $1,200.00 | Line Haul | Flat | 1 | $1,200.00 |
| $300.00 | Layover | Flat | 1 | $300.00 |

*Rates that are based on weight or count will be calculated from the quantities loaded.*

**Total: $1,500.00 USD**

| Mode | Trailer Type | Trailer Size | Linear Feet | Temperature | Pallet/Case Count | Hazmat | Load Requirements |
|---|---|---|---|---|---|---|---|
| FTL | Reefer | 48 ft or 53 ft | | -20 | 18 pallets/1 cases | Non-Hazardous | |
| Special Temp Instructions | | | | | | LxWxH | |

| Pick-up Location | Date | Time |
|---|---|---|
| Fort Wayne, IN | 1/18/2023 | Appt 15:00 Note:preset |

**Commodities:**

| Pick Up # | Quantity | Unit | Commodity | Notes |
|---|---|---|---|---|
| 1 | 18 | Pallets | Ice Cream | |

| Delivery Location | Date | Time |
|---|---|---|
| Akron, OH | 1/19/2023 | Appt 10:00 Note:Confirmation #: 2162604 |

## CARRIER RESPONSIBLE FOR

| Unloading | None w/ valid unloading receipt | Pallet Exchange | None | Estimated Weight | 14372 |
|---|---|---|---|---|---|





If this box is checked, Carrier is required to mail original paperwork to TQL at the below address.

**CARRIER INVOICE #**

**FOR STANDARD MAIL**
TQL
PO Box 799
Milford, OH 45150

**OVERNIGHT DELIVERY**
TQL
1701 Edison Drive
Milford, OH 45150

### QUICK PAY

If your default payment terms are not Quick Pay and you would like Quick Pay on this load, please check one of the boxes below. Send your invoice to the Quick Pay email or fax listed below or via one of the document scanning options.

☐ 1 Day Quick Pay 5%          ☐ 7 Day Quick Pay 3%

**METHODS TO SUBMIT PAPERWORK**          Submit completed and signed paperwork within 24 hours of delivery.

### EMAIL
Quick Pay - Quickpay@tql.com
Standard - cinvoices@tql.com

### DOCUMENT SCANNING
TQL Carrier Dashboard - Send paperwork
for FREE via our web and mobile app

**TRANSFLO Express** allows you to scan and send invoices
and POD's to TQL for $3.50 from participating truck stops.

### FAX
Quick Pay - 513-688-8895
Standard - 513-688-8782

TQL must approve all accessorial terms/charges in advance and in writing. Payment of detention is determined on a load-by-load basis. Unauthorized charges will not be paid. Detention payment does not begin for at least 3 hours unless otherwise agreed to in writing. To qualify for additional compensation, the Carrier MUST notify TQL at least 30 minutes before beginning detention time and when arriving-on-time/departing from all shippers/receivers (unless the shipper/receiver will notate check in/out times on the paperwork).



# REDUCE CHECK CALLS BY ACCEPTING TQL TRACKING ON ALL YOUR LOADS.
Download the FREE TQL Carrier Dashboard mobile app.

THIS IS AN AGREEMENT BETWEEN TQL AND CARRIER. CARRIER SHALL HAUL THE LOAD AT THE RATE ABOVE. CARRIER SHALL CALL TQL FOR LOAD INFORMATION. IF LOAD IS CHANGED OR CANCELED BY TQL, NO "TRUCK ORDER NOT USED" WILL BE PAID UNLESS TQL HAS PROVIDED THE CARRIER WITH LOAD DETAILS (PICK-UP NUMBER, SHIPPER NAME/ADDRESS AND DRIVER INFORMATION SHEET) AND APPROVED THE CARRIER TO BEGIN DRIVING TOWARDS THE PICK-UP LOCATION. THE SAFE, LEGAL AND PROPER OPERATION OF CARRIER SUPERSEDES ANY REQUEST, DEMAND, PREFERENCE, INSTRUCTION OR INFORMATION PROVIDED BY TQL OR ITS CUSTOMERS WITH RESPECT TO ANY SHIPMENT. IF ANY EMPLOYEE OF TQL OR ITS CUSTOMER REQUESTS, DEMANDS, OR INSTRUCTS CARRIER TO TAKE ANY ACTION THAT VIOLATES ANY LAW, CARRIER SHALL REFUSE TO TRANSPORT THE LOAD AND IMMEDIATELY CONTACT TQL BEFORE TAKING ANY FURTHER ACTION. CARRIER AGREES THAT WHEN IT CHOOSES TO TRANSPORT A LOAD IT DOES SO ON ITS OWN VOLITION, EXERCISING ITS OWN DISCRETION WITHOUT COERCION OR UNDUE INFLUENCE BY ANY INDIVIDUAL OR ENTITY. **CARRIER OR ITS AGENT CERTIFIES THAT ANY TRU EQUIPMENT FURNISHED WILL BE IN COMPLIANCE WITH INUSE REQUIREMENTS OF CALIFORNIA'S TRU REGULATIONS. THIS AGREEMENT IS SUBJECT TO THE TERMS OF THE BROKER/CARRIER AGREEMENT SIGNED BY THE CARRIER AND TQL. THIS AGREEMENT IS AN ADDENDUM TO THE BROKER/ CARRIER AGREEMENT. THIS RATE CONFIRMATION IS INCLUSIVE OF ALL CHARGES.
IF THIS SHIPMENT RELATES TO A GOVERNMENT OR QUASI-GOVERNMENT CONTRACT (WHICH MAY INCLUDE, WITHOUT LIMITATION, FEDERAL, STATE, MUNICIPAL, OR POSTAL CONTRACTS), THEN THE SHIPMENT IS SUBJECT TO THE NOTICES AND COMPLIANCE REQUIREMENTS FOUND AT HTTPS://WWW.TQL.COM/GOVERNMENT-CONTRACTOR-NOTICES.PDF OR A HARD COPY WILL BE PROVIDED UPON WRITTEN REQUEST TO COMPLIANCE@TQL.COM.
BY SIGNING THIS DOCUMENT, THE CARRIER AND ITS DRIVER AGREE THAT THEY MAY LEGALLY RECEIVE SMS (TEXT) MESSAGES ORIGINATING FROM TQL. RESPONDING TO OR READING A TQL SMS MESSAGE WHILE DRIVING A TRUCK OR MOTOR VEHICLE CAN CAUSE SERIOUS INJURY, DEATH, OR PROPERTY DAMAGE TO YOU OR OTHERS. DO NOT READ OR REPLY TO A MESSAGE UNLESS YOUR VEHICLE IS STATIONARY AND PARKED. THE CARRIER, DRIVER, AND ANY OTHER EMPLOYEE AND/OR AGENT FOR CARRIER ASSUME ALL RESPONSIBILITY FOR ABIDING BY THESE INSTRUCTIONS AND AGREE THAT THEY WILL COMPLY WITH ALL APPLICABLE FEDERAL, STATE AND LOCAL LAWS INCLUDING, BUT NOT LIMITED TO: RECEIVING, READING AND/OR SENDING SMS MESSAGES, PHONE CALLS, AND/OR ANY OTHER INFORMATION TO OR FROM THE BROKER. CARRIER AGREES TO INDEMNIFY AND HOLD TQL HARMLESS TO THE FULLEST EXTENT PERMITTED BY LAW FOR ANY AND ALL CLAIMS OF ANY NATURE ARISING OUT OF OR RELATING TO THE HAULING OF THIS LOAD, THE VIOLATION OF THE TERMS OF THE BROKER-CARRIER AGREEMENT OR THIS RATE CONFIRMATION.

## Carrier Requirements:

• Driver must accept and maintain TQL's Carrier Dashboard Tracking the entirety of the shipment. Failure to





comply may result in less or reduced layover.
- If delivering to a Walmart or C&S location- Driver must turn in their gate pass.
- Driver(s) must wear a safety vest and the shipper and receiver.
- All pages of the BOLs/PODs must be turned in for payment.
- Lumper and late fee (with broker approval) receipts must be submitted within 5 business days of load completion in order to be reimbursed.

## Trailer Requirements:

- Trailer must be clean, food grade, in sound physical condition, odor free, dry, leak proof, and free of contamination/infestation.
- Exclusive use of the trailer is required, and the load cannot be run as a partial.

## Seal Requirements:

- Seal must be applied at the shipper, and the trailer must show up to receiver with original seal from shipper intact.
- Any evidence of tampering with the seal, doors, other product on the truck, or transloading of product will result in a full truckload claim.

## Temperature controlled shipments:

- Trailer temperature must be set to -20F the entirety of the shipment.
- Trailer must be pre-cooled to -10F upon arrival at shipper to be considered on time.

## Detention/Layover Compensation:

- Detention starts 3 hours after APPT and 4 hours after FCFS at $25.00 an hour for Dry & $30.00 an hour for reefer
- Layover is $300.00 max for reefer and $250.00 max for dry loads.
- Detention/layover must be requested within 5 business days of load completion. Carrier waives the right to detention/layover payment after 5 business days load completion.

## Lumper Compensation:

- Valid lumper receipts are required for reimbursement.
- Lumper and late fee (with broker approval) receipts must be submitted within 5 business days of load completion in order to be reimbursed. Valid lumper receipts, showing PO/Date/Facility Name and/or Tax ID# are required for reimbursement.
- Carrier waives the right to receipt reimbursement if submitted after 5 business days.

## Truck Order Not Used Compensation:

- TONU eligibility begins 2 hours after rate confirmation is accepted by carrier
- Carrier will receive $150 under an updated PO for TONU compensation.
- TONU's will be issued to carriers if load is cancelled for any reason within the 24 hours following pick up appointment. After 24 hour period, a layover will be issued in lieu of TONU.

**Once submitted, allow 5 days for accessorials to be processed**





| Note to Carrier | DRIVER MUST OPT-IN TO TQL TRACKING FOR DURATION OF LOAD IF LOAD NEEDS TO BE RETURNED. RETURN RATE IS $1.50/MI +$60 STOP OFF CHARGE |
| --- | --- |



T Q Y L



TQL PO# 23197637

_____
Carrier Representative Signature

*By electronically signing below and acknowledging acceptance, I confirm I have the authority to act on behalf of, and bind the undersigned individual and/or entity, and have agreed to

Name* S/   ɔta Polkowska Springf



# TQL DETENTION REQUEST

**TOTAL QUALITY LOGISTICS**

THIS FORM ALLOWS CARRIERS TO COMMUNICATE THEIR ACCESSORIAL REQUESTS ON DELIVERED LOADS AND MUST BE COMPLETED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY.

| Carrier Name | MC # | TQL PO # |
|---|---|---|
| Pink Cheetah Express Llc | 1038832 | 23197637 |

## LOCATION DETAILS

| Detention Location | Time Detained | Requested Rate |
|---|---|---|
| Akron, OH | 1 Days | $300.00 Per Day |

Did you notify TQL via email, text or call upon arrival and departure from all shippers and receivers?*    ■Yes  ☐No

Did you notify TQL via email, text or call 30 minutes before you are requesting detention begins?*    ■Yes  ☐No

Did the driver get check in and check out times documented on the BOLs and signed off on by the shipper or receiver?

☐Yes  ■No

If the shipper/receiver refused to document check in and check out times, did you notify TQL via email, text or call before the

driver left the shipper or receiver?*    ☐Yes  ☐No    ■N/A

| Contact Name* | Contact Phone Number* | Contact Email* | Date* |
|---|---|---|---|
| Dakota Polkowska Springfields | (407) 479-8632 | pinkcheetahexpress@yahoo.com | 01/20/2023 |

☒ BY CHECKING THIS BOX AND CLICKING SUBMIT BELOW, I (ON BEHALF OF THE CARRIER ENTITY I REPRESENT) AGREE TO THE **TERMS AND CONDITIONS** AND ACKNOWLEDGE THAT (1) I AM A REPRESENTATIVE OF THE CARRIER, (2) I HAVE THE AUTHORITY TO ENTER INTO CONTRACTS BINDING THE CARRIER, (3) MY ACT IN SUBMITTING THIS FORM ELECTRONICALLY IS INTENDED TO BE MY ELECTRONIC SIGNATURE, AND (4) ANY INFORMATION I ENTER WILL BE STORED ON LOCAL MACHINE'S CACHE TO ALLOW FOR EASIER ACCESS IF NECESSARY AT A LATER TIME.



# TQL

**TOTAL QUALITY LOGISTICS**

DRIVER/CARRIER CONFIRMATION SHEET TQL PO# 29197837

| Pickup Dates | Delivery Dates |
|---|---|
| 1/18/23 | 1/19/23 |

## TQL CONTACT INFO

| Name | Phone | Email | Fax |
|---|---|---|---|
| Ryan Steadly | 800-580-3101 x52016 | teamsteadly@tql.com | 5135228376 |

## CARRIER CONTACT

| Name | Dispatcher | Driver |
|---|---|---|
| Pink Cheetah Express Llc (fl) | Dakota | Dakota |

## LOAD INFORMATION

| Mode | Trailer Type | Trailer Size | Temperature | Pallet/Case Count | Hazmat | Load Requirements |
|---|---|---|---|---|---|---|
| FTL | Reefer | 48 ft or 53 ft | -20 | 18 pallets/1 cases | Non-Hazardous | |

Special Temp Instructions

## CARRIER RESPONSIBLE FOR

| Unloading | None w/ valid unloading receipt | Pallet Exchange | None | Estimated Weight | 14372 |
|---|---|---|---|---|---|

## PICKUPS

| Shed | City | State | Zip | PU# | Date | Time |
|---|---|---|---|---|---|---|
| INTERSTATE COLD STORAGE (FT WAYNE,IN) (FORT WAYNE,IN) | Fort Wayne | IN | 46804 | US041_107 / 23000749SO | 1/18/2023 | Appt 15:00 Note:preset |

**Information:**

6606 Lincoln Pkwy
Fort Wayne, IN 46804

**MUST HAVE 3/4 REEFER FUEL

**Commodities:**

| Quantity | Unit | Commodity | Notes |
|---|---|---|---|
| 18 | Pallets | Ice Cream | |

## DROPS

| Consignee | City | State | Zip | Delivery PO | Date | Time |
|---|---|---|---|---|---|---|
| SHERWOOD AKRON FREEZERS (AKRON,OH) | Akron | OH | 44305 | 843332 | 1/19/2023 | Appt 10:00 Note:Confirmation #: 2162604 |

**Information:**

Sherwood Akron Freezers
2700 Gilchrist Rd
Akron, OH 44305

Page 1 of 3



T Q Y L



**Note to Carrier**

DRIVER MUST OPT-IN TO TQL TRACKING FOR DURATION OF LOAD
IF LOAD NEEDS TO BE RETURNED. RETURN RATE IS $1.50/MI +$60 STOP OFF CHARGE

## Carrier Requirements:

- Driver must accept and maintain TQL's Carrier Dashboard Tracking the entirety of the shipment. Failure to comply may result in loss of detention/layover.
- If delivering to a Walmart or C&S location- Driver must turn in their gate pass.
- Driver(s) must wear a safety vest and the shipper and receiver.
- All pages of the BOLs/PODs must be turned in for payment.
- Lumper and late fee (with broker approval) receipts must be submitted within 5 business days of load completion in order to be reimbursed.

## Trailer Requirements:

- Trailer must be clean, food grade, in sound physical condition, odor free, dry, leak proof, and free of contamination/infestation.
- Exclusive use of the trailer is required, and the load cannot be run as a partial.

## Seal Requirements:

- Seal must be applied at the shipper, and the trailer must show up to receiver with original seal from shipper intact.
- Any evidence of tampering with the seal, doors, other product on the truck, or transloading of product will result in a full truckload claim.

## Temperature controlled shipments:

- Trailer temperature must be set to -20F the entirety of the shipment.
- Trailer must be pre-cooled to -10F upon arrival at shipper to be considered on time.

## Detention/Layover Compensation:

- Detention starts 3 hours after APPT and 4 hours after FCFS at $25.00 an hour for Dry & $30.00 an hour for reefer
- Layover is $300.00 max for reefer and $250.00 max for dry loads.
- Detention/layover must be requested within 5 business days of load completion. Carrier waives the right





## Lumper Compensation:

- Valid lumper receipts are required for reimbursement.
- Lumper and late fee (with broker approval) receipts must be submitted within 5 business days of load completion in order to be reimbursed. Valid lumper receipts, showing PO/Date/Facility Name and/or Tax ID# are required for reimbursement.
- Carrier waives the right to receipt reimbursement if submitted after 5 business days.

## Truck Order Not Used Compensation:

- TONU eligibility begins 2 hours after rate confirmation is accepted by carrier
- Carrier will receive $150 under an updated PO for TONU compensation.
- TONU's will be issued to carriers if load is cancelled for any reason within the 24 hours following pick up appointment. After 24 hour period, a layover will be issued in lieu of TONU.

**Once submitted, allow 5 days for accessorials to be processed**

TQL PO# 23197637

THIS AGREEMENT IS SUBJECT TO THE TERMS OF THE BROKER/CARRIER
AGREEMENTS SIGNED BY THE CARRIER AND TQL. THIS AGREEMENT IS AN
ADDENDUM TO THE BROKER/CARRIER AGREEMENT. THIS DOCUMENT IS ONLY FOR
INFORMATIONAL PURPOSES.

Page 3 of 3

 

**COMDATA**

**Comchek** ®

4573169156

Pay to the order of ___Tagz Team___

Date ___1/19/23___

The sum of ___Three hundred fifty & 00/100___ _____ Dollars

$ 350.00

DO NOT CASH BEFORE CALLING

AUTHORIZATION NUMBER

Company ___TQL___

NOTE: This draft is not valid and will not be honored without obtaining an authorization number before cashing or accepting for payment. To obtain this number, call

**800-741-3030**

VOID AFTER 180 DAYS OF ISSUANCE

Robert E. Kribbs, Treasurer

CARD NO. OR EXPRESS CODE

___4781988303 7443___

PAYEE'S PHONE NUMBER

___(347) 494-2356___

STATE

IDENTIFICATION NUMBER

**IMPORTANT:** THIS DRAFT WILL NOT BE HONORED WITHOUT GOVERNMENT ISSUED PHOTO IDENTIFICATION BEING RECORDED TO THE RIGHT. (SEE REVERSE SIDE FOR EXAMPLES)

PAYABLE THROUGH *Wells Fargo Bank, NA* Issued by Comdata TN, Inc.; in California, by Comdata Network, Inc. of California

⑈4573169156⑈ ⑆102100400⑆ 8300000000000000⑈

# TAGZ TEAM

*Lumper Service, LLC*

## RECEIPT

**DO NOT MOVE YOUR TRUCK AWAY FROM THE DOCK DOOR UNTIL IT IS SAFE TO DO SO. THE TRAILER SHOULD NOT LEAVE THE DOOR UNTIL YOU HAVE RECEIVED YOUR PAPERWORK AND EXIT PASS!**

TAGZ TEAM LUMPER SERVICE IS NOT RESPONSIBLE FOR THE PAPERWORK OR EXCHANGE PALLETS. THIS IS THE SOLE RESPONSIBILITY OF SHERWOOD FOODS.

DATE  01 / 19 / 23

TRUCKING CO. NAME  Pink Cheetah

TRAILER NO.  4673

AMOUNT PAID  350.00

LUMPER'S NAME  Anthony

LUMPER'S SIGNATURE

DRIVER'S SIGNATURE

TAGZ TEAM LUMPER SERVICE, LLC

EIN #  47-4854654

THANK YOU FOR USING TAGZ TEAM LUMPER SERVICE. PLEASE DRIVE SAFELY.

# INTERSTATE COLD STORAGE, INC.

STRAIGHT BILL OF LADING – SHORT FORM – Original – Not Negotiable

Page 1 of 3

RECEIVED, subject to the classification and written agreement between carrier and shipper in effect on the date of issue of this original Bill of Lading. The property described below in apparent good order, except as noted (contents and condition of contents unknown) marked, consigned, and destined as indicated below, which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading as set forth (1) in Uniform Freight Classification in effect on this date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment. Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading set forth in the classification or tariff which governs the transportation of this shipment and the said terms and conditions are hereby agreed to by the shipper and accepted for himself and his assigns.

**B/L NO.** O-660078

**CARRIER:** TOTAL QUALITY LOGISTICS

**DATE SHIPPED:** 01.18.23

FROM : Interstate Cold Storage, Inc.
6606 Lincoln Parkway
Fort Wayne, IN   46804

**FOR:**
**CUSTOMER:** DREYER'S
**ACCOUNT:** DREYER

### CONSIGNED TO AND DESTINATION:

Sherwood Foods Cold Storage
2700 Gilchrist Ave
Akron, 44   US

### PLEASE SEND FREIGHT BILL TO:

ATTN: ACCOUNTS PAYABLE
PO 22002987
3426 NORTH WELLS STREET
Fort Wayne, IN
46808

SHIPPING INFORMATION
Time:   15:37:20

Must Maintain -20 Degrees F

| CUSTOMER ORDER NUMBER | PURCHASE ORDER NUMBER | CAR OR VEH. INITIALS | SEALS |
|---|---|---|---|
| 23000749SO | 23000749SO | 673 | 0074502 |

| ITEM LOT NO. | DESCRIPTION OF ARTICLES | QUANTITY | PLTS | Grs. Wgt. Net Wgt. (Subj. to Corr.) | |
|---|---|---|---|---|---|
| | 843332 Order Remarks: Load Number: 107 CUSTOMER PO: 843332 | | | | *Subject to Section 7 of Conditions of applicable bill of lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement. The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. |
| 31000019 22705804E234 | HD CHOC8X14OZ | 63 | 1 | 415.80 415.80 | **SIGNATURE OF CONSIGNOR** |
| | 00100280000341588299 10074570014009 | | | | If charges are to be prepaid, write or stamp here "To be Prepaid." |
| 31000020 22865804E272 | HD CHOCPEANUTBUTR8X14OZ | 63 | 1 | 423.36 423.36 | Prepaid |
| | 00100280000341730414 10074570950154 | | | | |
| 31000036 22985802E720 | HD VAN8X14OZ | 63 | 1 | 415.80 415.80 | Received $ to apply in prepayment of the charges on the property described hereon. |
| | 00100280008041217860 10074570004000 | rejected | 63 | | Agent or Cashier |
| 31000048 22555806E901 | HD SORBETRASPBERRY8X14OZ | | 1 | 413.91 413.91 | Per (The Signature here acknowledges only the amount prepaid.) |
| | 00100280000412597328 10074570434005 | | | | Charges Advanced: |
| 31000120 23115803U608 | DS VANMP6 (4X4.6OZ) | 144 | 1 | 881.28 881.28 | $ |
| | 00100280000333488613 00072554754777 | | | | |
| 31000333 22755804E167 | HD BUTRPECAN8X14OZ | 63 | 1 | 415.80 415.80 | †Shippers imprint in lieu of stamp not a part of bill of lading approved by the Interstate Commerce Commission. |
| | 00100280000341633883 10074570114006 | | | | ‡The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Consolidated Freight Classification. |
| 31000338 2301580418 | HD COFFEE8X14OZ | 63 | 1 | 412.65 412.65 | If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight." |
| | 00100280000341854240 10074570034007 | Short 4cs | | | NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. |
| 31000402 22715802C131 | DS VANCRMLMP6 (4X4.6OZ) | 144 | 1 | 912.96 912.96 | The agreed or declared value of the property is hereby specifically stated by the shipper to be not |
| | 00312001097000050039 00072554863936 | | | | exceeding per $ |

Shipper, **Per** _____

Agent, **Per** _____



**STRAIGHT BILL OF LADING — SHORT FORM — Original — Not Negotiable**

# INTERSTATE COLD STORAGE, INC.

Page    2 of    3

Subject to the classification and written agreement between carrier and shipper in effect on the date of issue of this original Bill of Lading.

*Received, subject to the classifications and tariffs in effect on the date of the issue of this Bill of Lading, the property described below in apparent good order, except as noted (contents and condition of contents unknown) marked, consigned, and destined as indicated below which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination if on its route, otherwise to deliver to another carrier on the route to said destination...*

**CARRIER:** TOTAL QUALITY LOGISTICS

**DATE SHIPPED:** 01.18.23

**B/L NO.** O-660078

**FROM:** Interstate Cold Storage, Inc.
6606 Lincoln Parkway
Fort Wayne, IN    46804

**FOR:**
**CUSTOMER:** DREYER'S
**ACCOUNT:** DREYER

**CONSIGNED TO AND DESTINATION:**
Sherwood Foods Cold Storage
2700 Gilchrist Ave
Akron, 44    US

**PLEASE SEND FREIGHT BILL TO:**
ATTN: ACCOUNTS PAYABLE
PO 22002987
3426 NORTH WELLS STREET
Fort Wayne, IN
46808

**SHIPPING INFORMATION**
Time: 15:37:20

Must Maintain -20 Degrees F

| CUSTOMER ORDER NUMBER | PURCHASE ORDER NUMBER | CAR OR VEH. INITIALS | SEALS |
|---|---|---|---|
| 23000749SO | 23000749SO | 673 | 0074502 |

| ITEM / LOT NO. | DESCRIPTION OF ARTICLES | QUANTITY | PLTS | Grs. Wgt. Net Wgt. (Subj. to Corr.) |
|---|---|---|---|---|
| 31000403 22535804C472 | DS VANFGMP6 (4X4.6OZ) 00100280000341457366 00072554358142 | 144 | 1 | 1080.00 1080.00 |
| 31000405 23115803C923 | DS VANMP5 (8X4.6OZ) 00100280000333494928 00072554848117 | 90 | 1 | 923.40 923.40 |
| 31000405 23115803C926 | DS VANMP5 (8X4.6OZ) 00100280000333495086 00072554848117 | 90 | 1 | 923.40 923.40 |
| 31000405 23115803C932 | DS VANMP5 (8X4.6OZ) 00100280000333495406 00072554848117 | 90 | 1 | 923.40 923.40 |
| 31000407 22565802L259 | DS CKIEDPDMP5 (8X4.6OZ) 00100280008040792948 00072554620270 | 90 | 1 | 935.10 935.10 |
| 31000407 22565802L260 | DS CKIEDPDMP5 (8X4.6OZ) 00100280008040792955 00072554620270 | 90 | 1 | 935.10 935.10 |
| 31000407 22565802L261 | DS CKIEDPDMP5 (8X4.6OZ) 00100280008040792962 00072554620270 | 90 | 1 | 935.10 935.10 |
| 31000408 23075802L409 | DS CRUNCHDIPMP5 (8X4.6OZ) 00100280008041302641 00072554619892 | 90 | 1 | 901.80 901.80 |
| 31000408 23075802L414 | DS CRUNCHDIPMP5 (8X4.6OZ) 00100280008041302795 00072554619892 | 90 | 1 | 901.80 901.80 |

*Subject to Section 7 of Conditions of applicable bill of lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:*

*The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.*

**SIGNATURE OF CONSIGNOR**

*If charges are to be prepaid, write or stamp here "To be Prepaid."*

**Prepaid**

Received $ _____
to apply in prepayment of the charges on the property described hereon.

Agent or Cashier

Per _____
(The Signature here acknowledges only the amount prepaid.)

Charges Advanced.
$ _____

†Shippers imprint in lieu of stamp not a part of bill of lading approved by the Interstate Commerce Commission.
†The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Consolidated Freight Classification.
If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."
NOTE — Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not

exceeding _____

per _____

Shipper, Per _____

Agent, Per _____

# ICS COLD STORAGE, INC.

STRAIGHT BILL OF LADING – SHORT FORM – Original – Not Negotiable

Subject to the classification and written agreement between carrier and shipper in effect on the date of issue of this original Bill of Lading

| | |
|---|---|
| | **Page** 3 of 3 |

**CARRIER:** TOTAL QUALITY LOGISTICS  **DATE SHIPPED:** 01.18.23

**B/L NO.** 0-660078

**FROM** : Interstate Cold Storage, Inc.
6606 Lincoln Parkway
Fort Wayne, IN 46804

**FOR:**
**CUSTOMER:** DREYER'S
**ACCOUNT:** DREYER

**CONSIGNED TO AND DESTINATION:**
Sherwood Foods Cold Storage
2700 Gilchrist Ave
Akron, 44 US

**PLEASE SEND FREIGHT BILL TO:**
ATTN: ACCOUNTS PAYABLE
PO 22002987
3426 NORTH WELLS STREET
Fort Wayne, IN
46808

SHIPPING INFORMATION  Must Maintain -20 Degrees F
Time: 15:37:20

| CUSTOMER ORDER NUMBER | PURCHASE ORDER NUMBER | CAR OR VEH. INITIALS | SEALS |
|---|---|---|---|
| 23000749SO | 23000749SO | 673 | 0074502 |

| ITEM / LOT NO. | DESCRIPTION OF ARTICLES | QUANTITY | PLTS | Grs. Wgt. Net Wgt. (Subj. to Corr.) | |
|---|---|---|---|---|---|
| 31000408 23085802L435 | DS CRUNCHDIPMP5(8X4.6OZ) 00100280008041315238 00072554619892 | 90 | 1 | 901.80 901.80 | *Subject to Section 7 of Conditions of applicable bill of lading, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement. |
| 31000435 22925806L937 | MICKEY MOUSEBARMP4(6X3OZ) 00100280000412697769 00072554448027 | 150 | 1 | 703.50 703.50 | The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. **SIGNATURE OF CONSIGNOR** |
| 31000590 U21722298105 | DS MCVANMP10(20X0.845OZ) 00340079938017374142 00072554122620 | 96 | 1 | 962.88 962.88 | If charges are to be prepaid, write or stamp here "To be Prepaid" **Prepaid** |
| 31000609 23065802E565 | FP CUPMP12(4X3.25OZ) 00100280008041292287 10072554001915 | 112 | 1 | 1120.00 1120.00 | Received $ ___ to apply in prepayment of the charges on the property described hereon. **Agent or Cashier** |
| 31000610 22495802E612 | FP PBCUPMP12(4X3.25OZ) 00100280008040720170 10072554110181 | 112 | 1 | 1116.64 1116.64 | Per ___ (The Signature here acknowledges only the amount prepaid.) |
| | Pallet Weight (22 @ 70 lbs) | | | 1540.00 | Charges Advanced: $ ___ |
| | | 2090 | 22 | 19095.48 17555.48 | |

Handwritten: 8~~ ~
SED 1/19/23
12EC-2020

†Shippers imprint in lieu of stamp not a part of bill of lading approved by the Interstate Commerce Commission.
‡The fibre boxes used for this shipment conform to the specifications set forth in the box maker's certificate thereon, and all other requirements of Consolidated Freight Classification.
If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."
NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.
The agreed or declared value of the property is hereby specifically stated by the shipper to be not

exceeding ___ per ___

Shipper, **Per** ___    Agent, **Per** ___

| | | | |
|---|---|---|---|
| **Carrier ID:** | 1777875 | **Agreement Date:** | 6/10/2019 1:08:09 AM (Pacific Time) |
| **Carrier Name:** | PINK CHEETAH EXPRESS LLC | **MC Number:** | MC1038832 |
| **Address:** | 3508 SOMERSET CIR | **US DOT Number:** | 3284151 |
| **City, State & Zip:** | KISSIMMEE, FL 34746 | **DBA Name:** | Pink Cheetah Express LLC |
| **Contact:** | Dakota Polkowska Springfields | **W9 State:** | FL |
| **Phone:** | 407-479-8632 | **W9 Incorporation Type:** | Individual/Sole Proprietor or single-member LLC |

## Payment Terms

> **Your selection will remain as your default payment terms until TQL is notified that you would like your terms changed.** If no selection is made, your payment terms will default to **28 DAYS.** Payment terms can be updated at any time through your TQL Carrier Dashboard account.

\*\*All pay terms are calculated from the day TQL **receives** your complete and legible paperwork\*\*

**Payment Terms:** Please select **ONE** payment term as your regular payment term.

____ **28-Day Pay** - No fees – check mailed or payment direct deposited within 28 days of TQL receiving complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8782 or e-mail to cinvoices@tql.com.

_X_ **7-Day Quick Pay** - A 3% service charge will be deducted from the gross truck rate. This is issued through either check or direct deposit. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "Quick Pay" on your invoice and/or the Rate Confirmation. Payment will be issued within 7 days of TQL receiving complete and legible paperwork.

____ **1-Day Quick Pay** - A 5% service charge will be deducted from the gross truck rate. Payment is made with either a Comchek, which includes a $25 dollar per invoice Comchek fee, or direct deposit with no Comchek fee. **To use this option you must mark "1-Day Quick Pay" clearly on both your envelope and invoice/Rate Confirmation.** A Comchek will be issued in the amount owed one business day after TQL receives complete and legible paperwork. Please see the *Invoice Information* section of the Rate Confirmation for paperwork submission instructions. If original documents are required, please mail them. If originals are not required, please fax paperwork to 513-688-8895 or e-mail to quickpay@tql.com and be sure to write or type "1-Day Quick Pay" on your envelope and invoice/Rate Confirmation.

> \*\*If we receive your paperwork on Friday, you will receive your Comchek on Monday (1-Day Quick Pay and 7-Day Quick Pay will not be guaranteed if there are any problems with the load overages, shortages, late delivery, temperature issues, etc.).

> \*\*\*You can select 1-Day Quick Pay on a per invoice basis if you have selected either 28-Day or 7-Day. To use this option "1-Day Quick Pay" must be marked clearly on both your envelope and invoice/Rate Confirmation.

_Yes_ **Direct Deposit \*** - Select if you want direct deposit ( **available on all payment terms** ). CARRIER authorizes Total Quality Logistics, LLC ( "TQL") to initiate automatic deposits to CARRIER's account at the financial institution entered. CARRIER also authorizes and permits TQL to make withdrawals from this account if a credit entry is made in error or to pay any amount that CARRIER may owe to TQL.

CARRIER agrees to release, defend, indemnify, and hold TQL harmless from and against any delay or loss of funds due to incorrect or incomplete information supplied by CARRIER or CARRIER's financial institution or due to an error on the part of CARRIER's financial institution in depositing funds to CARRIER's account. CARRIER agrees that TQL cannot be held responsible or liable for overdrafts or overdraft fees incurred before funds are deposited. This agreement and authorization will remain in effect until TQL receives a written notice of cancellation or changes from CARRIER or CARRIER's financial institution.

E-mail Address for Remittance Advices: PinkCheetahExpress@yahoo.com

\*Direct Deposit: Only available on continental United States bank accounts and may not be available on initial loads due to bank account setup time.

*TQL allows invoices and bills of lading to be sent via fax, email, mobile device scanning, or TransFlo scanning. Sending paperwork via one of these methods will ensure we receive your documents the same day and will help you get paid faster. Fax invoices to (513) 688-8782 or email them to cinvoices@tql.com for **28-Day pay** . Fax invoices to (513) 688-8895 or email them to quickpay@tql.com **for all 1-Day and 7-Day Quick Pays.** Our TransFlo code is **TQYL** for TransFlo Express truck stop scans, or **TQYLV** for scans using TransFlo Velocity downloadable software. Before sending paperwork electronically, please check your TQL Rate Confirmation to be sure that original paperwork is not needed. This information can be found in the "Invoice Information" section of the Rate Confirmation. If the box is checked, then original documents are required and you must mail your paperwork to receive payment.*

> All paperwork submitted must be complete and legible and include:
>
> - Invoice with your company name and address, and with your payment terms clearly indicated. TQL's Rate Confirmation can serve as your invoice. Payment will be made according to terms printed on the Rate Confirmation, unless you indicate a different term on your invoice or Rate Confirmation.
> - Original B.O.L./P.O.D. signed by the receiver.
> - Any unloading or pallet receipts with TQL authorization number printed on them.

## Comchek Authorization

Comcheks are available only after freight has been loaded. If you would like to limit who at your company is permitted to receive Comcheks, please mark the appropriate "No" box below. If the "No" box is not selected, that category of persons are permitted to receive Comcheks. If nothing is marked, then you are indicating that Comcheks may be given to any person representing you or your company. TQL will **not** be responsible for unauthorized persons obtaining Comcheks on behalf of your company. Due to business concerns, all drivers, dispatchers, and other representatives of your company are eligible to receive unloading (lumper) Comcheks. TQL must be notified separately **in writing** if you do not want anyone at your company to be able to receive unloading (lumper) Comcheks. There is a $25 fee for each Comchek issued. The amount permitted for fuel advance Comcheks is limited to the lesser of 40% of the gross truck pay or $2,000.

**Drivers** are permitted to receive fuel advance Comcheks.          Yes __X__ No _____

**Dispatchers** are permitted to receive fuel advance Comcheks.          Yes __X__ No _____

**Anyone** at our company is permitted to receive fuel advance Comcheks. Yes __X__ No _____

## ***TQL After-Hours and Weekend/Holiday Comchek Procedure***

TQL after-hours personnel can only issue a fuel advance Comchek upon confirmation from the shipper that the truck has been loaded. In the event that we are unable to reach a shipper, we may request a fax copy of each ansteved every bill of lading before issuing the fuel advance Comchek. Furthermore, to ensure that we are giving the fuel advance Comchek to the correct carrier, it is imperative that all drivers be able to recite their company's MC number. TQL after-hours personnel cannot issue an advance for more than 40% of the total rate to the truck up to a $2,000.00 maximum advance. This policy will be in effect after 5 P.M. EST every weekday and throughout each weekend and holiday.

## Diverse Owned Business

Is your company a **certified** diverse-owned business *(under a federal, state, or local diversity contracting program based upon the diversity of its ownership)?*

Yes _____ No __X__

If so, what category?

# BROKER/CARRIER AGREEMENT

This BROKER/CARRIER AGREEMENT ( "Agreement") is made by and between Total Quality Logistics, LLC ( "BROKER" or "TQL"), an Ohio limited liability company whose main office is located in Cincinnati, Ohio, and the motor carrier identified in the signature block at the end of this Agreement ( "CARRIER" (BROKER and CARRIER are collectively referred to as the "Parties" or individually as "Party"), and is effective on the date on which this Agreement is signed by CARRIER ( "Effective Date").

**WHEREAS**, BROKER is licensed by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration ( "FMCSA") in Docket No. MC-322572 to engage in operations, in interstate or foreign commerce, as a broker as defined in 49 U.S.C.A § 13102, arranging for transportation of freight (except household goods), and as a broker only. BROKER arranges transportation services for various shippers, brokers, consignors, consignees, motor carriers with broker authority, and other third parties (individually or collectively "CUSTOMER(S)"). The term CUSTOMER includes each shipper, receiver, consignor, and/or consignee related to each load, regardless of who tenders the freight or makes payment to BROKER; and

**WHEREAS**, CARRIER holds the operating authority (identified as the CARRIER MC# and/or DOT# in the signature block at the end of this Agreement) ( "Operating Authority") to engage in transportation as a for-hire carrier of property (except household goods) under contracts with shippers, receivers, and/or brokers of general commodities, and shall transport said property under its own Operating Authority and subject to the terms of this Agreement, and CARRIER possesses the necessary competence, expertise, personnel, equipment, licensure, certifications, registrations, and any and all other resources and qualifications necessary to perform the Services (defined below) required in this Agreement in a legal, professional, and safe manner, and makes the representations in this Agreement for the purpose of inducing BROKER to enter into this Agreement; and

**WHEREAS**, BROKER, to satisfy some of the freight transportation needs of its CUSTOMERS, desires to use the services of CARRIER, on a non-exclusive basis, to pickup, secure, transport, and deliver CUSTOMERS' freight in compliance with this Agreement ( "Services").

**NOW, THEREFORE**, for good and valuable consideration, the Parties agree as follows:

1. **TERM.** The term of this Agreement ( "Term") shall be one (1) year, commencing on the Effective Date, and such Term shall automatically renew for successive one-year periods, unless terminated by either Party. Either Party may terminate this Agreement on 30-days prior written notice, to the other Party, without cause, or as otherwise provided in this Agreement. Either Party may terminate this Agreement immediately upon written notice to the other Party for any breach of this Agreement.
2. **CARRIER'S COVENANTS.** In performing the Services, CARRIER agrees that it shall, at all times during the Term, and at its own expense, comply with the following covenants:
    a. CARRIER shall provide a sufficient number of drivers, with enough available hours of service, to pick up and deliver the tendered load(s) within the time frame(s) requested by BROKER and/or its CUSTOMERS, without violating the FMCSA hours of service regulations, set forth in 49 C.F.R. § 395.3, or any other Laws (defined below);
    b. CARRIER shall maintain knowledge of and compliance with all federal, state, and local laws and regulations related to the Services ( "Laws"), including, without limitation, those laws and regulations related to the transportation of Hazardous Materials, as defined in 49 C.F.R. §§ 172.800, .173, and .397; security; owner/operator lease and lease agreements; loading and securing of freight; implementation and maintenance of driver safety programs (including, without limitation, hiring, controlled substances, and hours-of-service requirements); sanitation, temperature, and contamination requirements for transporting food, perishable, and other products; qualifying, licensing, and training of drivers; implementation and maintenance of equipment safety regulations; environmental or emissions programs in areas in which CARRIER operates, including, without limitation, California Transport Refrigeration Unit (TRU) and Airborne Toxic Control Measure (ATCM); and maintenance and exclusive control of the means and method of transportation, including, without limitation, performance of its drivers and all applicable insurance Laws. CARRIER certifies that any TRU equipment furnished will be in compliance with the in-use requirements of all of California's TRU regulations. CARRIER will be responsible for any and all fines assessed against any party, including BROKER and CUSTOMERS, for CARRIER's failure to adhere, in whole or in part, to any ARB/ACTM regulation or any other Laws. **BROKER is an equal opportunity employer and federal contractor; thus, if CARRIER provides Services subject to a federal contract, then CARRIER agrees that, to the extent applicable: (1) CARRIER will comply with the following laws, which are incorporated herein by reference: Executive Order 11246, Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws, 41 CFR § 60-300.5(a), and 41 CFR § 60-741.5(a); and (2) CARRIER and its subcontractors shall abide by the requirements of 41 CFR § 60-300.5(a) and 41 CFR § 60-741.5(a). These regulations prohibit discrimination against qualified protected veterans and qualified individuals on the basis of disability and require affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans and qualified individuals with disabilities.**
    c. CARRIER shall perform the Services with the highest quality of professional skill and care demanded in the transportation industry, with due diligence, and in the best interest of and to the satisfaction of BROKER and CUSTOMERS, each of which shall be determined by BROKER in its sole discretion.
    d. CARRIER bears the ultimate and exclusive responsibility to manage, govern, discipline, direct, and control its employees, agents, contractors, owner/operators, leasees, and equipment in compliance with all Laws. CARRIER and BROKER agree that the safe, legal, and proper operation of the CARRIER and its drivers shall supersede any requests, demands, preferences, instructions, or information provided by BROKER or CUSTOMERS with respect to any shipment; and if any employee of BROKER or CUSTOMERS requests, demands, or instructs CARRIER to do any act in violation of any Laws, CARRIER shall immediately contact BROKER.
    e. CARRIER shall notify BROKER immediately if its Operating Authority is revoked, suspended, downgraded, negatively affected, or rendered inactive for any reason, and/or if CARRIER or any related entity is sold, and/or its stock or interests assigned, if there is a change in control of ownership, and/or any insurance required by this Agreement is threatened to be or is terminated, cancelled, suspended, or revoked for any reason. If CARRIER performs any Services without proper Operating Authority, then it shall defend, indemnify, and hold BROKER, CUSTOMERS, and related parties harmless under the terms of Section 10 of this Agreement.
    f. CARRIER authorizes BROKER to invoice CARRIER's freight charges to shippers, consignees, or third-parties responsible for payment.
    g. Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, and stamped terms) or CARRIER's tariffs or circulars that are inconsistent with either the terms of this Agreement or any agreement between BROKER and CUSTOMERS are superseded by and shall be

controlled by the terms of this Agreement.

h. CARRIER is bound by any agreement entered into between BROKER and CUSTOMERS related to the loads. If CARRIER agrees to perform Services on any loads that involve the transportation of intermodal containers or trailers that are not owned by CARRIER, then CARRIER is fully responsible and liable for (i) ensuring that the container, trailer, and chassis are suitable for transport, including, without limitation, checking the brakes and tires of the trailer or chassis and properly securing containers to chassis; (ii) any loss or damage to the container, trailer, and chassis while in CARRIER's possession or control; and (iii) complying with any Laws, rail carrier tariffs or circulars, and agreements related to the container or trailer.

i. CARRIER agrees that this Agreement applies to any load tendered directly to CARRIER by BROKER, as well as any load which CARRIER knows or should have known involved BROKER.

3. **BROKER'S COVENANTS.** BROKER warrants and represents that it has authority to tender its CUSTOMERS' freight for transportation under this Agreement.

4. **COMPENSATION.** CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally:

   a. Any verbally agreed upon rates must be confirmed in a Rate Confirmation or other Electronic Communications. Notwithstanding anything to the contrary, whether in this Agreement, on a bill of lading, at law, or in any other writing, CARRIER's released rates or values, stamped terms, and/or tariff rules or circulars related to rates or compensation shall not be valid.

   b. As a condition to payment, CARRIER shall submit complete and legible invoices, clean bills of lading, and signed loading or delivery receipts for all Services. CARRIER agrees that BROKER is the sole party responsible for payment of CARRIER's invoices related to the Services and that, under no circumstances, will CARRIER contact or seek payment from any CUSTOMER or any other party responsible for any payment related to the Services. CARRIER waives any right to collect from CUSTOMERS, unless BROKER provides CARRIER with consent in a writing signed by a vice president or C-level officer of BROKER.

   c. BROKER and CARRIER shall use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER shall have the right to audit, from time to time, CARRIER's freight charges, and CARRIER shall fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3.

   d. Except in the case of *force majeure*, CARRIER is responsible for any and all additional costs incurred by BROKER when replacement or cover Services are required arising out of CARRIER's failure to perform the Services as agreed.

   e. CARRIER hereby expressly waives its right to any lien on any freight or other property of CUSTOMERS, except warehouseman lien rights that are exercised in strict compliance with this Agreement.

   f. In any claim by CARRIER against BROKER relating to this Agreement, BROKER's liability shall be limited to the lesser of either (i) the freight costs for the particular load as confirmed in writing or (ii) direct damages, but shall not include consequential, incidental, special, or punitive damages.

   g. Notwithstanding any other provision in this Agreement to the contrary, BROKER may offset against CARRIER's pending invoices for any amounts due to BROKER, including, without limitation, those arising from or related to cargo claims, CARRIER'S breach of this Agreement, or CARRIER's indemnity obligations to BROKER or CUSTOMERS.

5. **DOT SAFETY RATING.** CARRIER represents and warrants that it does not have an "Unsatisfactory" safety rating issued by the FMCSA, and shall notify BROKER in writing immediately if its safety rating changes in any way, including, without limitation, a change to an "Unsatisfactory," "Conditional," "Unfit," "Marginal," or other negative rating. CARRIER shall be responsible for any and all liability and damages asserted against or imposed on BROKER and CUSTOMERS arising out of CARRIER's violation of this Section, including, without limitation, attorneys' fees, expert costs, and all other related costs.

6. **INSURANCE.** At all times during the Term, CARRIER shall maintain in effect the following types and amounts of insurance coverage from reliable insurance companies having an AM Best rating of A-VII or better: Automobile ("Auto") liability $1,000,000; motor vehicle (including hired and non-owned vehicles) $1,000,000 (or $5,000,000 per incident if transporting hazardous materials), which includes coverage for environmental damages and remediation arising out of the release or discharge of hazardous substances; cargo damage/loss $100,000; and workers' compensation with limits required by applicable state law. It is the sole responsibility of CARRIER to ensure compliance with the above limits at all times during the Term. All such insurance shall be written and be required to respond and pay prior to any other available coverage of BROKER or CUSTOMERS. CARRIER shall also comply with the following:

   a. Except as specified above, all insurance policies shall comply with the minimum requirements of the FMCSA and any other Laws. Insurance certificates furnished by CARRIER to BROKER are an affirmative representation by CARRIER that CARRIER complies with the insurance requirements set forth in this Agreement and all Laws. Nothing in this Agreement shall be construed to limit liability of the CARRIER to the insurance limits set forth above, nor shall any exclusion, declaration, or deductible amount in any insurance policy absolve CARRIER from financial liability for any loss or damage. It is CARRIER's sole responsibility to abide by the terms and conditions of its insurance policies, and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any and all liability or claims that arise from or are related to CARRIER's failure to maintain such coverage or abide by the terms and conditions of such policies.

   b. CARRIER shall furnish BROKER with a certificate of insurance, in a form satisfactory to BROKER, to prove that each coverage specified in this Section is in effect and properly maintained and that neither BROKER nor its CUSTOMERS are obligated to pay premiums for any such insurance. Each certificate of insurance shall name BROKER as certificate holder, additional insured, and loss payee, with a waiver of subrogation in favor of BROKER and CUSTOMERS. In addition, when available, CARRIER shall obtain an automatic additional insured endorsement which shall apply to BROKER. CARRIER must provide BROKER with at least 30 days advance notice prior to cancellation, change, or non-renewal.

   c. CARRIER shall pay all premiums and deductible amounts under any applicable insurance policies. Upon request by BROKER, CARRIER shall provide a complete copy of all applicable policies along with any exclusions, exemptions, or riders that are not depicted in the governing certificate of insurance. In addition, by signing this Agreement, CARRIER expressly grants BROKER the authority to obtain an actual copy of the policies in effect at the time of any loss directly from CARRIER's insurance companies, and further authorizes its insurance companies to release to BROKER any and all of CARRIER's insurance policies requested by BROKER. In the event any issues arise with respect to CARRIER's insurance, CARRIER agrees to cooperate to the fullest extent possible with BROKER to obtain such information or facilitate communication. CARRIER grants BROKER the right to contact and communicate directly with its insurance companies to the fullest extent of CARRIER's rights.

   d. CARRIER shall only utilize vehicles and drivers that are licensed, identified, and insured under CARRIER's own name and insurance policies with the limits specified above. CARRIER is fully liable for any loss or damage not covered by insurance as a result of CARRIER's failure to comply with this Section, and CARRIER agrees to indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any such loss or damage regardless of the

vehicle or driver used on any shipment tendered to CARRIER by BROKER.

7. **HAZARDOUS MATERIAL.** If CARRIER accepts BROKER's or CUSTOMERS' tender of a load to transport any shipment required to be placarded under Laws for hazardous materials ( "Hazmat"), then the additional provisions in Appendix A, including additional insurance requirements, shall also apply for each and every Hazmat shipment.

8. **CARGO LIABILITY AND CLAIMS.** CARRIER shall issue a bill of lading, listing itself as the motor carrier, in compliance with 49 U.S.C. §§ 80101-16, 49 C.F.R. §§ 373.101-.105, .201 (and any amendments thereto), for the property it receives for transportation under this Agreement. CARRIER is fully responsible and liable for the freight once in possession of it, and the trailer(s) is loaded, even partially, regardless of whether a bill of lading has been issued, signed, or delivered to CARRIER. CARRIER's responsibility and liability shall continue until proper and timely delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt evidencing successful delivery. The Parties also agree as follows:

   a. Any terms of the bill of lading (including, without limitation, payment terms, limitations of liability, stamped terms, etc.) that are inconsistent with the terms of this Agreement shall be controlled by the terms of this Agreement. CARRIER's failure to issue a bill of lading or sign a bill of lading acknowledging receipt of the cargo shall not affect liability of CARRIER. Under no circumstances shall CARRIER execute a bill of lading or any other document which represents BROKER as the party responsible for the transportation or delivery of freight.

   b. If a consignee refuses a shipment or CARRIER is unable to deliver it for any reason, CARRIER's liability as a warehouseman shall not begin until (i) CARRIER has provided BROKER with 24-hour prior written notice of request for direction and complied with those directions, or (ii) if no direction is received as provided in (i), CARRIER has placed the shipment in either a BROKER-approved public warehouse or in CARRIER's storage facility utilizing reasonable security measures.

   c. CARRIER shall comply with 49 C.F.R. §§ 370.1-.11 and any amendments, applicable regulations adopted by the FMCSA, and/or any other Laws relating to processing freight loss and damage claims and salvage. In the event goods are compromised or otherwise damaged, BROKER or its CUSTOMER, in its sole reasonable discretion, may determine whether the goods are salvageable, and if salvageable, the value of the salvageable goods.

   d. Except as otherwise provided in this Agreement, all liability standards, time limitations, and burdens of proof regardless of whether the CARRIER has common or contract Operating Authority shall be governed by common law applicable to common carriers, federal transportation Laws, and by the Carmack Amendment codified in 49 U.S.C. § 14706, including on shipments that are exempt from such Laws such as intrastate shipments or shipments of exempt commodities. CARRIER agrees to accept notice of a claim in the form issued by BROKER, including, without limitation, by Electronic Communications.

   e. Notwithstanding the terms of 49 C.F.R. § 370.9, CARRIER shall acknowledge a claim within 30 days of receipt, and pay, decline, or make a settlement offer in writing on all cargo loss or damage claims within 60 days from the receipt of the claim. Failure of CARRIER to pay, decline, or offer settlement within this 60-day period shall be deemed an admission by CARRIER of full liability for the amount claimed and a breach of this Agreement.

9. **INDEPENDENT CONTRACTORS.** The relationship between BROKER and CARRIER shall, at all times, be that of independent contractors. As independent contractors, the Parties agree as follows:

   a. No terms or conditions of this Agreement, or any act or omission of either Party shall be construed for any purpose to express or imply a joint venture, partnership, principal/agent, fiduciary, or employer/employee relationship between the Parties.

   b. CARRIER and any of its approved carriers or agents shall employ, pay, supervise, direct, discipline, discharge, and assume full responsibility and control over all persons required for CARRIER's performance of the Services. BROKER has no right to discipline or direct the performance of any driver and/or employee, contractor, subcontractor, or agent of CARRIER. Under no circumstances shall CARRIER or any of its approved carriers, agents, or employees be deemed to be or hold themselves out as employees of BROKER or CUSTOMERS.

   c. CARRIER and BROKER agree that safe and legal operation of the CARRIER and its drivers shall completely and without question govern and supersede any service requests, demands, preferences, instructions, or information from BROKER or CUSTOMERS with respect to any shipment at any time.

   d. CARRIER agrees that a CUSTOMER's insertion of BROKER's name as the carrier on a bill of lading is without authorization and in error and shall be for the CUSTOMER's convenience only and shall not change BROKER's status or liability as a property broker only, nor CARRIER's status or obligations as a motor carrier.

   e. CARRIER agrees that any driving directions or routing instructions to or from a CUSTOMER's location given by BROKER are for informational purposes only. It is CARRIER's sole responsibility to ensure the directions are appropriate with regard to equipment, route, protection and securement of the cargo, and safe operation of the vehicle(s), and CARRIER assumes and is fully and exclusively responsible and liable for the route CARRIER actually takes while performing Services.

   f. CARRIER assumes all liability and agrees that it is fully and exclusively responsible for any and all contributions, benefits, taxes, and any other payments which might be expected in an employer-employee relationship, which includes, without limitation, the payment of the following items: any and all taxes under Laws (including payroll taxes), taxes for unemployment insurance, pensions, workers' compensation, and social security for each and every person engaged in CARRIER's performance of the Services. BROKER is not liable for any obligations specified above and CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from any claim, liability, interest, fines, or penalties imposed or asserted against BROKER or CUSTOMERS for any such obligations.

   g. CARRIER agrees that BROKER may, in BROKER's sole discretion, track any or all shipments with or without CARRIER's knowledge by electronic tracking or otherwise.

10. **INDEMNIFICATION.** CARRIER agrees to defend, indemnify, and hold BROKER and CUSTOMERS harmless from and against any and all claims or liability (including, without limitation, Workers' Compensation claims), arising out of or in any way related to CARRIER's negligence, willful misconduct, acts, omissions, or performance or failure to perform under this Agreement, including, without limitation, claims or liability for cargo loss and damage, theft, delay, damage to property, and bodily injury and/or death. Except for Workers' Compensation claims, CARRIER shall not be required to indemnify any party (including BROKER) for claims or liability that are directly and solely caused by the negligence or willful misconduct of that party.

11. **BROKER'S ACCOUNTS.** CARRIER agrees to treat all BROKER's CUSTOMERS as BROKER's accounts during the Term, making no contact with CUSTOMERS except the minimum level of contact necessary to perform the Services. If this Agreement is terminated for any reason, CARRIER shall not solicit freight or provide transportation services to any CUSTOMERS for a period of 12 months after the termination date of this Agreement. If CARRIER solicits freight or provides transportation services to any CUSTOMERS in violation of this Section, then, in addition to any other remedies available under the law (including punitive damages), CARRIER shall also be liable to BROKER for all costs and expenses incurred to enforce this Section, including, without limitation, court costs and attorneys' fees. This Section shall not apply to CUSTOMERS for whom CARRIER has (without the assistance of, introduction by, or involvement in any way of BROKER) performed transportation services in the twelve (12) months immediately preceding the Effective Date, which must be proved in writing.

12. **CO-BROKERING.** CARRIER is prohibited from brokering, re-brokering, co-brokering, subcontracting, transferring, trip leasing, assigning, or interlining the transportation of shipments to any other person or entity conducting business under an operating authority different from CARRIER's Operating Authority without advance written authorization from BROKER. If BROKER becomes aware of such prohibited activity by CARRIER prior to payment of any compensation otherwise due CARRIER, then BROKER may withhold payment to CARRIER and instead pay appropriate compensation to the motor carrier that actually transported the shipment. Any subcontracting or brokering of any shipment by CARRIER to any third party shall be deemed an assignment of CARRIER's right to be compensated for that shipment to the third party. Upon BROKER's payment to delivering carrier, CARRIER shall not be released from any liability to BROKER under this Agreement. CARRIER will be liable for any and all losses or damages (including reasonable attorney's fees and costs) for violation of this Section.

13. **WAIVER AND DISCHARGE.** The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver of such provision or the waiver of the right of either Party to enforce such provision in the future or in any way to affect the validity of this Agreement or any part of this Agreement. To the extent that terms and conditions in this Agreement are inconsistent with Part (b), Subtitle IV of Title 49 U.S.C. (ICC Termination Act of 1995)(the "Act"), the Parties expressly waive any or all rights and remedies they may have under the Act.

14. **NOTICES.** All notices required or permitted under this Agreement shall be in writing, signed by or on behalf of the Party giving the notice, and sent to the other Party at its main office listed above via certified U.S. Mail, overnight courier with delivery receipt, or facsimile with machine printed proof of delivery.

15. **GOVERNING LAW.** This Agreement shall be governed by the laws of the State of Ohio, except to the extent that federal transportation laws and regulations preempt those laws, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law. The Parties consent to the jurisdiction of the state court located in Clermont County, Ohio, waive any objection to the jurisdiction of that court, and agree that any dispute between the Parties, including, without limitation, those arising under or related to this Agreement, shall be brought in that court, which shall have exclusive jurisdiction over such dispute. The prevailing Party in any lawsuit between the Parties shall be entitled to all reasonable expenses, attorneys' fees, and costs (including court costs).

16. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the Parties. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and no extrinsic evidence may be introduced to reform or change this Agreement in any judicial or equitable proceeding arising out of this Agreement. Any changes to this Agreement must be in a writing executed by both Parties.

17. **INVALIDITY OF PROVISIONS / SEVERABILITY.** Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such a manner as to make such provision valid, legal, or enforceable.

18. **ASSIGNMENT AND DELEGATION.** This Agreement shall inure to the benefit of and be binding upon the successors and assigns of both Parties. Notwithstanding anything to the contrary in this Agreement, BROKER may assign this Agreement, whether in whole or part, without notice to or consent of CARRIER, to any entity which controls, is controlled by, or is under common control with BROKER or which acquires all or substantially all of the assets or ownership interests of BROKER, provided that said assignee assumes, in full, the obligations of BROKER under this Agreement.

19. **FACTORING.** CARRIER shall provide BROKER written notice of any assignment, factoring, amendment, or other transfer of its right to receive payment arising under this Agreement ("Pay Assignment") at least thirty (30) days prior to the effective date of such Pay Assignment, which may affect BROKER's payment obligations. BROKER is not obligated to honor any Pay Assignment unless such notice is proper and timely received. At minimum, each written notice shall include the name and address of the factoring company, assignee, or transferee; date signed; date Pay Assignment is to begin; and the terms of the Pay Assignment. Notice is considered delivered upon receipt of written notice by BROKER. BROKER shall have the right to ask for, and CARRIER shall be obligated to furnish, any further documentation BROKER requires in order to satisfy BROKER as to the authenticity and requirements of the Pay Assignment. BROKER's payment obligations shall not be subject to more than one Pay Assignment at any one time. Any and all Pay Assignments are taken subject to all the terms of this Agreement regardless of when or if BROKER receives a notice of Pay Assignment. CARRIER shall indemnify, defend, and hold BROKER and CUSTOMERS harmless from and against any and all lawsuits, claims, actions, and damages (including reasonable attorneys' fees, costs, liabilities, and liens) arising from, imposed upon BROKER in connection with, or in any way related to any Pay Assignment. If CARRIER wants to terminate a Pay Assignment, a written release from the CARRIER and the Pay Assignment's assignee, in a form satisfactory to BROKER's counsel, must be received by BROKER specifying the terms and date of release. If CARRIER fails to comply with any one of the requirements of this Section, then CARRIER releases and waives any and all right, claim, or action against BROKER and CUSTOMERS for any amount due and owing under this Agreement.

20. **ELECTRONIC COMMUNICATIONS.** The following terms apply to any and all Electronic Communication (defined below) with BROKER:
    a. During the Term, the Parties anticipate that they will exchange materials and information in electronic form, including, without limitation, through websites, e-mail, fax, text messaging, mobile apps, and other electronic means (collectively "Electronic Communications"), and each Party consents to receiving Electronic Communications related to the Services.
    b. Under no circumstances will BROKER be liable for, and CARRIER hereby expressly waives and releases BROKER from, any liability for any loss or damage caused by computer viruses, Trojans, worms, or similar programs.
    c. Electronic Communications may contain information that is confidential and subject to legal privilege. Such Electronic Communications are intended solely for the individual or entity to whom it is addressed and to others who have the authority to receive it, and CARRIER may not, under any circumstances, disclose, copy, or distribute the information without BROKER's written consent.
    d. BROKER does not make any representation regarding any links and does not endorse the products or services that may be offered from or through any link. BROKER accepts no responsibility for the content or use of information contained in any link.
    e. Unless otherwise noted, Electronic Communications are subject to intellectual property rights of BROKER. Use of the content in web pages, electronic or written publications, smartphone applications, or any other media and/or words, phrases, names, designs, or logos that are BROKER's trademarks are prohibited without the express written permission of BROKER.
    f. BROKER disclaims all implied warranties, including, without limitation, warranties of compatibility, security, and accuracy, and BROKER will not be liable for any special, indirect, consequential, or punitive damages of any kind arising out of the use of Electronic Communications by CARRIER.
    g. By providing an email address to BROKER, CARRIER is expressly opting-in to BROKER's promotional email distribution list. CARRIER can opt-out at any time by contacting BROKER via telephone, email, or mail.
    h. CARRIER understands that all calls to or from BROKER may be recorded, and CARRIER consents to being recorded during any and all calls with BROKER. CARRIER waives and releases BROKER from any liability or claim related to calls with BROKER being recorded, and waives any right to obtain a copy of such recording to the extent any such right exists under the law.

21. **CONFIDENTIALITY.** In addition to confidential information protected by law, whether statutory or otherwise, the Parties agree that all of their financial information and that of CUSTOMERS, including, without limitation, freight and brokerage rates, amounts received for brokerage services, amounts of freight

charges collected, amounts of freight charges paid, freight volume requirements, as well as related CUSTOMER information, CUSTOMER shipping or other logistic requirements shared or learned between the Parties and CUSTOMERS shall be treated as confidential, and shall not be disclosed or used for any reason without prior written consent by the Parties. If confidentiality is breached, the Parties agree that the remedy at law, including monetary damages, may be inadequate and that the Parties shall be entitled, in addition to any other remedy available, to an injunction restraining the violating Party from further violation of this Agreement.

22. **GENERAL CARRIER DUTIES.** CARRIER agrees as follows: *(These duties are in addition to any other duties required in this Agreement or in Laws)*

   a. Drivers shall check in with BROKER every day (including Saturday, Sunday, and holidays) between 8:00 a.m. and 9:00 a.m., EST, giving their current location and load temperature.

   b. CARRIER shall call BROKER immediately to report any problems related to the Services. BROKER is available 24 hours a day, 7 days a week, 365 days a year.

   c. CARRIER shall report any overage, shortage, or damage at loading or delivery to BROKER immediately upon becoming aware of such overage, shortage, or damage, and CARRIER assumes all liability for failing to so notify BROKER.

   d. CARRIER is responsible for any damage or loss to the product, shipment, or its packaging, and any and all shortages, from the time the shipment, or any portion thereof, first comes into CARRIER's possession or control at pickup, until the shipment is no longer in CARRIER's possession or control at delivery.

   e. If any payment for lumper services (loading/unloading) is agreed upon between BROKER and CARRIER, CARRIER must supply a legible unloading receipt with lumper's full name, address, and contact information accompanied by the BROKER's authorization number assigned to this particular load. Unless CARRIER provides this information within 24 hours of delivery, CARRIER will not be reimbursed for lumper costs.

   f. For all pallet exchange loads, the number of pallets in and out must be clearly notated on the original bill of lading.

   g. All loads tendered to CARRIER require *exclusive* use of trailer space solely for the freight related to that particular load, unless otherwise agreed in writing with BROKER. CARRIER assumes all liability, including, without limitation, any costs incurred by BROKER, caused by CARRIER loading any unauthorized freight on a load.

   h. Any costs incurred by BROKER due to CARRIER being late for pick-up or delivery appointments may be charged to CARRIER.

   i. Any product which must be disposed of must have prior consent from BROKER before being disposed of by any party. If a load is disposed of without prior written consent from BROKER, CARRIER is liable for the entire value of the load, plus any other associated damages. CARRIER is required to remit to BROKER any funds received from salvage and/or insurance.

   j. Before loading begins, CARRIER's driver must have a sufficient number of load locks or other suitable cargo securing devices to secure the load.

   k. Loads that are sealed at the shipping point are to remain sealed until an authorized person at the receiver breaks the seal. If the seal is broken by an unauthorized person, CARRIER shall be fully liable for the greater of either the invoice amount to CUSTOMER or (ii) the cost of the product. In addition, CARRIER shall also be liable for any other expenses arising from or related to the unauthorized removal of the seal.

   l. CARRIER shall provide a trailer that is in sound mechanical and structural condition, and is clean, dry, free of defects, and suitable in all respects to accept, load, and transport the shipment.

   m. CARRIER shall not, unless expressly authorized to do so by BROKER, contact or communicate directly with CUSTOMER. This includes CARRIER's agents, representatives, heirs, or assigns. This Section 22(m) shall not prohibit communication with dock workers, as long as such communication is limited to the minimum amount of communication necessary to perform the Services for that load.

   n. CARRIER's drivers shall not, under any circumstances, use a cellular phone, whether by talking, texting, or otherwise, while operating a vehicle related to the Services.

   o. At all times, CARRIER shall use proper, working equipment acceptable to CUSTOMER, train its personnel in sanitary transportation practices and document all training, maintain all necessary records, abide by all Laws, and follow all protocols communicated to CARRIER when transporting human and/or animal food.

23. **CARRIER DUTIES FOR REFRIGERATED LOADS.** In order to fulfill CUSTOMERS' delivery and tracking requests, if CARRIER accepts BROKER's tender of a refrigerated load, then CARRIER agrees as follows: *(These duties are in addition to the General Carrier Duties listed above)*

   a. Prior to loading, CARRIER shall confirm that the reefer unit is working properly and pre-cool trailer to the temperature specified on BROKER's Rate Confirmation. The temperature on BROKER's Rate Confirmation will be in Fahrenheit unless otherwise specified in writing. CARRIER must strictly adhere to the temperature listed on the Rate Confirmation and shall make sure the temperature pulped for the product at loading is reflected on the bill of lading.

   b. Trailers hauling refrigerated loads are required to have a properly functioning air chute for circulation. It is CARRIER's responsibility to make sure the chute is not damaged, obstructed, blocked, or malfunctioning in any way. It is CARRIER's sole responsibility to make sure sufficient space is provided for air circulation in front, rear, top, bottom, and between the load.

   c. CARRIER shall check pulp temperature of the product to ensure that product has been pre-cooled to the proper temperature prior to loading. CARRIER shall not accept any product with a pulp temperature that is more than 2 degrees above or below the specified temperature noted on BROKER's Rate Confirmation. If the temperature on BROKER's Rate Confirmation differs from that on the bill of lading, CARRIER shall call BROKER before signing the bill of lading or transporting the freight. If CARRIER loads or otherwise accepts freight contrary to the terms on BROKER's Rate Confirmation or applicable bill of lading, CARRIER is liable for any and all loss or damage arising from or related to such acceptance.

   d. By signing the bill of lading, CARRIER is confirming that the correct product and correct product count were received at the proper temperature. CARRIER is solely responsible for cargo loss or damage incurred related to discrepancies in product information between the bill of lading, Rate Confirmation, and the actual product. If a discrepancy as to count, condition, or temperature is encountered, CARRIER shall immediately notify BROKER, and no change to loading information shall be made until confirmed in writing by BROKER.

   e. CARRIER shall continuously maintain the temperature noted on BROKER's Rate Confirmation from pickup at shipper until delivery at receiver. CARRIER shall not, at any time, set reefer on start/stop, cycle, or any other non-continuous temperature setting unless otherwise notified in writing by BROKER. CARRIER shall contact BROKER immediately in the event of any problems including, without limitation, out-of-temperature condition, equipment malfunction, accident, or delay.

24. **SURVIVAL.** The terms and conditions of this Agreement which contemplate the need for performance after the expiration or termination of this Agreement, which includes, without limitation, provisions regarding indemnification, solicitation of CUSTOMERS, attorneys' fees, cargo liability, claims processing, and compensation for Services performed prior to termination, shall survive any such expiration or termination of this Agreement.

25. **RECITAL PARAGRAPHS / HEADINGS.** The statements in the recital paragraphs at the beginning of this Agreement are true and correct and may be relied

upon in this Agreement. However, the Section headings in this Agreement are for convenience only and shall not be used to interpret this Agreement.

26. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts and by the Parties in separate counterparts, and may be exchanged by Electronic Communications. Each executed counterpart shall be deemed to be an original and all of which together shall constitute one and the same agreement. CARRIER's execution of the signature page and return of that page to BROKER, shall be evidence that CARRIER has agreed to all of the terms and conditions of this Agreement without change or modification.

**IN WITNESS WHEREOF,** the Parties have, through their duly authorized representatives, executed this Agreement, and by signing below, the Parties acknowledge that they have read this Agreement in its entirety; understand the terms and conditions of this Agreement; have had the opportunity to consult with legal counsel regarding terms and conditions of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

FMCSA Legal Name: PINK CHEETAH EXPRESS LLC
Name of Authorized Carrier Representative: Dakota Polkowska Springfields
Title of Authorized Carrier Representative: Manager
Phone number of Authorized Carrier Representative: 407-479-8632
Email of Authorized Carrier Representative: PinkCheetahExpress@yahoo.com

Agreement Date: 6/10/2019

☑ "I, Dakota Polkowska Springfields, am the Manager for Pink Cheetah Express LLC. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated 6/10/2019 1:08:09 AM Pacific Time between TQL and Pink Cheetah Express LLC and legally bind Pink Cheetah Express LLC to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I acknowledge I have read this agreement in its entirety; understand the terms and conditions of this agreement; and knowingly, voluntarily, and willfully enter into this agreement without any duress or coercion of any kind. THE AGREEMENT SHALL BE BINDING ON PINK CHEETAH EXPRESS LLC. I UNDERSTAND AND ACKNOWLEDGE THAT PINK CHEETAH EXPRESS LLC IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."



EXHIBIT
B



3508 SOMERSET CIR, KISSIMMEE, FL 34746

PinkCheetahExpress@yahoo.com

(347) 494-2356

October 31, 2023

The Honorable Pete Buttigieg

Secretary of Transportation

1200 New Jersey Ave SE,

Washington, DC 20590

Dear Secretary Buttigieg:

I am the managing member of Pink Cheetah Express, LLC (USDOT 3284151). Unlike most independent truckers regulated by your Department, I hold a JD degree so I know how to research, interpret and apply the law.

This is a complaint to the United States Department of Transportation (USDOT) against Total Quality Logistics (TQL) regarding the issue of property broker rate transparency, which, as you know, has been an issue for hundreds of thousands of independent truckers over the past three and a half years ever since truckers protested outside the White House for three weeks starting on May 1, 2020.

1

On March 16, 2023, Federal Motor Carrier Safety Administration (FMCSA) approved May 2020 petitions for rulemaking from the Owner Operator Independent Drivers Association (OOIDA) and the Small Business in Transportation Coalition (SBTC) requesting enhanced 49 CFR Part 371 regulations to stop brokers' practice of coercing independent truckers and motor carriers to waive the broker rate transparency regulations in 49 CFR 371.3 as a condition for receiving loads.

On March 17, 2023, FMCSA denied an opposing petition from the Transportation Intermediaries Association (TIA) to repeal the broker rate transparency regulations codified in 49 CFR Part 371 outright.

Recently, the FMCSA advised the public it will not commence rulemaking on these petitions until October 31, 2024, more than one year from now.

On October 24, 2023, the FMCSA denied the SBTC's September 27, 2023 request for an order directing all property brokers to immediately cease and desist from evading the 49 CFR 371.3 regulation through contractual waivers as an interim enforcement measure and to compel brokers' compliance with 371.3c requests to review records. I also understand whereas SBTC requested that FMCSA commence rulemaking sooner than a year from now, that request, too, was denied.

On May 1, 2023, the SBTC through its attorney Laurence Socci wrote the letter referenced below to Total Quality Logistics (TQL) on behalf of my company Pink Cheetah Express, LLC, which had previously requested to review TQL's transactional records pursuant to 49 CFR 371.3 and was denied. The SBTC demanded on my behalf as an SBTC member that TQL immediately cease and desist from violating 49 CFR 371.3. SBTC asserted that waivers of the broker rate transparency regulation are unlawful as matters of the evasion of regulation statute (49 U.S. Code § 14906,) unreasonable restraint of trade and caselaw. Larry Minor at FMCSA was copied.

On May 7, 2023, the SBTC thereafter, filed the ethics complaint below against TQL with TIA regarding this matter also copying FMCSA. TIA responded by issuing what SBTC has characterized as a bogus cease and desist letter to SBTC alleging defamation because SBTC characterized TIA advocacy staff's lobbying actions in support of its members' attempts to evade regulation through contractual waivers as "problematic" and "underhanded," pointing to the sham petitioning exception to the *Noerr-Pennington Doctrine,* which SBTC vehemently protested in response as baseless and a futile intimidation tactic.

2

As indicated below, I personally received a denial from TQL in reply to my request to review transactional records on a load I hauled for TQL in violation of 49 CFR 371.3. I therefore have standing to file this complaint with you.

It appears TQL is engaging in unreasonable restraint of trade as a market manipulation scheme which is in violation of Antitrust laws.

As SBTC stated to you on September 27, 2023:

> "Simply stated, independent truckers and owner operators will not survive another year without you issuing an immediate moratorium order on brokers' unlawful practice of deregulating themselves through contractual waivers. There is sufficient case law that has established that regulated entities cannot contractually waive Federal law or regulations absent specific Congressional authority to do so (Hayes v. Delbert Services Corp 811 F.3d 666 (4th Cir. 2016)"...Delbert seeks to avoid federal law through the prospective waiver of federal law provision found in the arbitration agreement. But that provision is simply unenforceable. With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away. The just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce." )"

The SBTC advises me that nearly six months after its cease and desist letter, drivers are still reporting to SBTC that TQL continues to evade the 371.3 regulation in its contracts and rely on the waiver to deny drivers' regulatory rights to review transactional records the drivers are involved with. SBTC also advises other than an acknowledgement of receipt, it has not heard back from TIA on their ethics complaint against TQL.

As you know, the FMCSA has regulations prohibiting intimidation and coercion by brokers codified at 49 CFR 390.6 with respect to various regulations, including, but not limited to, 49 CFR § 369.5 Records, which requires of motor carriers:

> "Books, records and carrier operating documents shall be retained as prescribed in 49 CFR part 379, Preservation of Records."

3

I attempted in good faith to acquire records pursuant to 49 CFR 371.3 in furtherance of my obligations under 49 CFR § 369.5 but was coerced by TQL through the unlawful waiver from obtaining same in violation of 49 CFR 390.6.

Given the broker agent's tone and demeanor, I believe that I was treated in a discriminatory fashion because I am female, which makes me a minority in trucking.

As you also know, under Federal law (49 USC 13101(b)), you have a duty to carry out Congress' National Transportation Policy. I point to what I believe are the relevant sections involved in this matter below:

§13101. Transportation policy

(a) In General.-To ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to oversee the modes of transportation and-

(1) in overseeing those modes-

(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices;

(2) in overseeing transportation by motor carrier, to promote competitive and efficient transportation services in order to-

(A) encourage fair competition, and reasonable rates for transportation by motor carriers of property;

(B) promote efficiency in the motor carrier transportation system and to require fair and expeditious decisions when required;

(D) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public;

(F) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions;

(I) improve and maintain a sound, safe, and competitive privately owned motor carrier system;

(J) promote greater participation by minorities in the motor carrier system;

4

Accordingly, I hereby file this letter as a **coercion complaint** against TQL pursuant to 49 CFR 390.6.

Please also accept this letter as a **complaint against TQL pursuant to 49 U.S. Code § 14701(b):**

I hereby request USDOT conduct an investigation and issue an order enforceable by you and/or the Attorney General (and privately enforceable under 49 U.S. Code § 14704 - Rights and remedies of persons injured by carriers or brokers) directing TQL to (1) immediately provide me with copies of any and all documents for the load in question referenced below pursuant to my rights under 49 CFR § 371.3c; and (2) to cease and desist engaging in TQL's coercive practice of evasion of the 371.3 broker rate transparency regulations in any and all respects, no matter who is the carrier, and obstructing my obligation to preserve records under 49 CFR § 369.5 in violation of 49 U.S. Code § 14906. I respectfully request a copy of such an order.

I also ask you to take whatever other action USDOT deems just and proper, including assessing civil penalties and referring this matter to the USDOT Inspector General and/or the US Department of Justice's Antitrust Division.

Sincerely,

Dakota Polkowska Springfields, Managing Member

Pink Cheetah Express LLC

cc:     Hon. US Senator Marco Rubio

        Hon. US Senator Rick Scott

        SBTC

THE STATE OF TEXAS, COUNTY OF TRAVIS

Before me on this day personally appeared Dakota Polkowska Springfields, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed herein and, being by me first duly sworn, declared that the statements herein are true and correct.

Given under my hand and seal of office this 31st day of October 2023.

Jacob Emerson
Notary Public, State of Texas

Notarized online using audio-video communication



Jacob Emerson

ID NUMBER
133605927
COMMISSION EXPIRES
February 28, 2026

From: "James Lamb" <james@truckers.com>

Date: Sun, May 7, 2023 2:32 pm

To: reinke@tianet.org

Cc: burroughs@tianet.org, laurence.socci@soccilawfirm.com, delpercio@tianet.org, bond@tianet.org, larry.minor@dot.gov, compliance@tql.com, info@fiata.org, legal@fiata.org, "office@nsbs.bg" <office@nsbs.bg>, "secretariat@nsbs.bg" <secretariat@nsbs.bg>, "transexpress@transexpress.bg" <transexpress@transexpress.bg>

Subject: TIA Ethics Complaint from the SBTC against TQL

Dear Ms. Reinke,

As you know, the TIA issued a model contract between brokers and carriers years ago in the spirit of "best practices."

This document contains no language suggesting brokers should ask independent truckers and motor carriers to waive their regulatory rights to documents 49 CFR 371.3 designed to afford these parties to transactions to know broker commissions, which TIA calls "margins," as a condition to do business.

Notwithstanding TIA's failed August 2020 petition to FMCSA for rulemaking to repeal 49 CFR 371.3, which, as you know, the agency denied on March 17, 2023, it therefore appears that it is NOT the policy of TIA to recommend brokers evade regulation through contracts that waive truckers' rights to broker rate transparency.

It appears FMCSA has rejected TIA's argument that brokers are somehow shippers with the right to waive regulations pursuant to 49 CFR § 14101b.

We also note that FMCSA is proceeding with our request to strengthen the broker rate transparency rule as per its March 16, 2023 petition approval letter to SBTC.

We believe it therefore now well established that brokers are not shippers entitled to waive 49 CFR § 371.3c under 49 CFR § 14101b by virtue of the ICC Termination Act of

1995 and that FMCSA's attached March 1, 2022 interim letter, which affirms that brokers should be abiding by all regulations that apply to them during the pendancy of rulemaking, is now authoritative and binding upon all brokers including TQL and all other TIA members that operate as duly licensed and bonded property brokers.

Accordingly, the SBTC has issued a CEASE & DESIST letter to TQL for having language that makes waiver of 371.3 in its contracts as a condition for receiving loads from TQL.

Please see that letter below.

Comes now, the SBTC to file this non-member Ethics Complaint with TIA pursuant to your complaint procedures on behalf of the SBTC membership as many of our members have been adversely affected by what we believe is TIA's unethical if not unlawful policy contrary to your model agreement and Ethics Code.

By copy of this email, we hereby request that Polly Bond, TIA's staff member assigned to the Ethics Committee, please forward our compliant on to the Ethics Committee for adjudication.

We have duplicated your attached non-fillable PDF complaint form below and offer this complaint via email in accordance with your instructions posted at

https://www.tianet.org/wp-content/uploads/2019/02/Ethics-Complaint-Form.pdf

The SBTC requests your Ethics Commission please review and process our complaint and issue a determination as to whether TIA concludes TQL is indeed violating your ethics policy by circumventing we believe obviously in bad faith 49 CFR 371.3 –if not outright evading carriers' right to records in violation of 49 U.S. Code § 14906 - Evasion of regulation of carriers and brokers through waivers of 371.3 in its contracts.

Indeed, we believe this business practice does not conform to your Code of Ethics, which states:

1. A member shall deal fairly with customers, colleagues, fellow members, and the general public.

2. A member shall conduct his or her professional life in accordance with the interests of TIA, the third-party transportation services industry, and the general transportation public.

3. A member shall adhere to honesty and integrity and to generally accepted principles of professional conduct.

4. A member shall not engage in any practice, which tends to corrupt, the integrity of TIA, the third-party transportation services industry or process of government.

5. A member shall make proper, just, and prompt payment for all contractual obligations.

6. A member shall abide by all lawful agreements to which he or she is a party, including all agreements with shippers, carriers and other transportation intermediaries.

7. A member shall compete vigorously – but not unfairly – with other members.

8. If a member has evidence that another member has been guilty of unethical, illegal or unfair practices, including those in violation of this Code, the member shall present information promptly to TIA.


As we have stated to TQL we believe this practice may even raise restraint of trade issues and may result in a class action lawsuit under the existing private right of action if this practice is not immediately terminated and TOL commits on or before May 10, 2023 that it will in fact cease and desist from further engaging in this practice, which adversely affects our members and their regulatory rights.


We ask TIA please issue guidance to its members on this issue as a number of other brokers are engaged in this practice and they may be contacted by an attorney representing SBTC's in the near future if this problem persists.


Please advise us the TIA Ethics Committee's decision and whether TIA condemns or condones this waiver of 371.3 practice so that we may know how to proceed in furtherance of our members' rights under the law.


Thank you.


Sincerely,

/s/ JAMES LAMB, Executive Director

Small Business in Transportation Coalition, Inc. ("SBTC")

Truckers.com

Visit our new website:

www.smalltransportation.org

1775 I. (Eye) Street, NW, Suite 1150

Washington, DC 20006

@JimLambUSA

(202) 587-2751

## TIA ETHICS COMPLAINT

| Complaint Filed By: | Complaint |
| Made Against: | |
| Name JAMES LAMB | Name |
| Total Quality Logistics LLC (TQL) | |
| Company Small Business in Transportation Coalition, Inc. (SBTC) | Company |
| TQL   MC-322572 | |
| Address 1775 I. Street NW, Ste 1150 | Address |
| 4289 IVY POINTE BLVD | |
| City/St./Zip Washington, DC 20006 | City/St./Zip |
| CINCINNATI, OH   45245 | |
| Phone (202) 587-2751 | Phone |
| (513) 831-2600 | |
| Fax  N/A | Fax |
| Unknown | |
| Email James@truckers.com | Email |
| compliance@tql.com | |

9

Signature /s/ JAMES LAMB, SBTC Executive Director

Date 7 MAY 2023

1. Nature of complaint: (Attach additional sheet(s) if necessary.)

SBTC believes TQL is violating the fairness, honesty and integrity clauses in your Code of Ethics by having language in their contracts that makes waiver of 371.3 a condition for receiving loads from TQL because it is a blatant attempt to evade regulation in violation of 49 U.S. Code § 14906. We believe there can be no reasonable finding that this business practice is ethical when it violates Federal law and existing regulation.

SBTC also believes this does not conform to your best practices inherent within the attached model broker-carrier contract.

As TIA is a member of FIATA, we believe this practice violates FIATA policies as well

Antitrust Policy (fiata.org)

Best Practice Guide on Contract Management by FIATA - Flipsnack

FIATA is therefore copied here for their information.

2. Nature of Ethics Code Violations (Explain which TIA Ethics provisions you believe were violated and how):

(X) A member shall deal fairly with customers, colleagues, fellow members, and the general public.

Compelling a waiver of regulatory rights through contract in violation of 49 CFR 371.3 and 49 U.S. Code § 14906 is unfair

(X) A member shall conduct his or her professional life in accordance with the interests of TIA, the third party transportation services industry, and the general transportation public.

Compelling a waiver of regulatory rights through contract in violation of 49 CFR 371.3 and 49 U.S. Code § 14906 by a rogue brokerage is unprofessional, not in the interests of TIA , the 3PL industry or the general transportation public.

(X) A member shall adhere to honesty and integrity and to generally accepted principles of professional conduct.

Evading 49 CFR 371.3 in contracts in violation of 49 U.S. Code § 14906 is dishonest and lacks integrity to generally accepted principles of professional conduct as evidenced by TIA's own model broker-carrier agreement.  FMCSA seems to concur in their attached March 1, 2022 letter to the SBTC.

(X) A member shall not engage in any practice, which tends to corrupt, the integrity of TIA, the third-party transportation services industry or process of government.

We believe that compelling a waiver of regulatory rights through contract in violation of 49 CFR 371.3 and 49 U.S. Code § 14906 insults the rule of law and is corrupt.

We believe the media has raised serious concerns about past TIA leadership possibly colluding with USDOT officials in this area back in 2020:

Is FMCSA Coordinating With Brokers in Battle Over Freight Rate Transparency? - Transportation Nation Network (archive.org)

TIA therefore owes its members and the industry clarity on this issue and assurance it has regained its moral compass contrary to past appearances of impropriety.

(X) A member shall make proper, just, and prompt payment for all contractual obligations.

Payment made under cloak of secrecy in violation of 49 CFR 371.3 cannot be deemed "just."

(X) A member shall abide by all lawful agreements to which he or she is a party, including all agreements with shippers, carriers and other transportation intermediaries.

Agreements which evade regulation in furtherance of restraint of trade are unlawful under 15 USC §1, which states:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

(X) A member shall compete vigorously – but not unfairly – with other members.

TIA Members evading 49 CFR 371.3 are engaged in practices we believe constitute unfair trade practices and unfair competition with other TIA members, SBTC small broker, carrier and trucker members, and members of the industry generally.

If a member has evidence that another member has been guilty of unethical, illegal or unfair practices, including those in violation of this Code, the member shall present information promptly to TIA.

Although SBTC is a non-member, please see attached documents offered promptly after SBTC issued its cease and desist letter.

3. Remedy (Explain what you would like the Committee to do to resolve the complaint):

SBTC asks the TIA to please issue guidance to its members on this issue as a number of other brokers are engaged in what we contend is this unlawful and questionable business practice. Please advise SBTC the TIA Ethics Committee's decision in accordance with your time frame in your instructions and whether TIA condemns or

condones this waiver of 371.3 practice so that we may know how to proceed in furtherance of our members' rights under the law.

APPENDIX A

CEASE AND DESIST LETTER TO TQL

From: "Laurence Socci" <laurence.socci@soccilawfirm.com>

Date: Mon, May 1, 2023 7:54 pm

To: "compliance@tql.com" <compliance@tql.com>

Cc: "larry.minor@dot.gov" <larry.minor@dot.gov>

Subject: CEASE AND DESIST DEMAND

May 1, 2023                    via Compliance@TQL.com & U.S. Certified Mail, R.R.R.

Total Quality Logistics, LLC

Attn: Chris Brown, Legal Department

4289 Ivy Pointe Blvd.

Cincinnati, Ohio 45245

Re: CEASE AND DESIST DEMAND

Dear Mr. Brown:

I am the attorney for the Small Business in Transportation Coalition (SBTC), Inc., a 501c6 non-profit trade organization representing the interests of small business owners in the transportation industry.

It has come to our attention that Total Quality Logistics, LLC (TQL) is engaged in a questionable business practice, which involves requiring motor carriers and

13

independent truckers to contractually waive their rights to shipper rate information under 49 CFR 371.3 as a condition to do business with TQL.

Our member Pink Cheetah Express LLC has provided us with the attached agreement which states, in part:

4. COMPENSATION. CARRIER agrees to perform the Services for BROKER, under CARRIER's Operating Authority exclusively, at a rate mutually agreed upon in writing in a TQL Rate Confirmation ("Rate Confirmation"), which shall be incorporated into this Agreement, or by Electronic Communications (defined in Section 20). Additionally...

c. BROKER and CARRIER shall use commercially reasonable efforts to verify the accuracy of all freight charge billings invoiced by BROKER to CUSTOMERS for the Services performed by CARRIER. BROKER shall have the right to audit, from time to time, CARRIER's freight charges, and CARRIER shall fully cooperate with any audit. BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and   CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3..." (emphasis added).

Our member has also furnished us an email from Amy Unger, a TQL Legal Claims Specialist, dated March 17, 2023, which stated to Pink Cheetah Express:

"Please note that on June 10, 2019 Pink Cheetah Express LLC and Total Quality Logistics entered into a Broker Carrier Agreement ("Agreement").   Section 4(c) of the Agreement states in part:

BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3."

We note that TQL is a member of the Transportation Intermediaries Association (TIA) and that TIA, as a matter of best practices, published a model broker-carrier contract many years ago, which does not include the waiver language referenced above. It therefore appears TIA does not consider your waiver language to be reasonable and customary.

14

As you know, the FMCSA recently approved the SBTC's May 6, 2020 petition to open rulemaking on this matter and denied the Transportation Intermediaries Association's request to open rulemaking to repeal 49 CFR 371.3, thereby dismissing TIA's misguided argument that property brokers are shippers for the purposes of 49 CFR § 14101b with waiver rights under the law. We expect the rulemaking on our petition to commence shortly.

SBTC's position is that brokers licensed and regulated by the FMCSA may not circumvent duly promulgated regulations without being in violation of 49 U.S. Code § 14906 - Evasion of regulation of carriers and brokers. We note with respect to those brokers that do evade regulation, the statute clearly states:

"A person, or an officer, employee, or agent of that person, that by any means tries to evade regulation provided under this part for carriers or brokers is liable to the United States for a civil penalty of at least $2,000 for the first violation and at least $5,000 for a subsequent violation, and may be subject to criminal penalties."

Furthermore, the SBTC received the attached letter from FMCSA dated March 2, 2022 which we believe affirmed carriers' rights under 49 CFR 371.3 in 2022. Please note FMCSA stated last year:

"As to your request for guidance on compliance with Part 371 during the pendency of the related rulemaking petitions filed by SBTC, the Owner-Operator Independent Drivers Association (OOIDA), and the Transportation Intermediaries Association (TIA), all brokers remain subject to any requirements that are applicable to them. As to your request for guidance "on how motor carriers and independent truckers should handle situations in which they are told they may not have loads if the[y] choose to exercise their right to broker transparency," FMCSA will consider this request in connection with SBTC's May 2020 petition for rulemaking (emphasis added)."

Now that the TIA's request that FMCSA repeal 49 CFR 371.3 is off the table, we contend this letter is now authoritative and that TQL must abide by 49 CFR 371.3.

Lastly, as you know, "restraint of trade" is generally defined as any activity that prevents another party from conducting business as they normally would without such a restraint. We contend the caselaw is clear when it comes to evasion of federal regulation through

contract for the purpose of engaging in restraint of trade. We remind TQL that 15 USC §1 states:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

We offer this 2022 summary of actions before SCOTUS on the matter of unreasonable restraint of trade:

https://supreme.justia.com/cases-by-topic/antitrust/

With many of our members affected by TQL's evasion of regulation through contact, it would appear that this matter is now ripe for a class action.

Accordingly, and on behalf of independent truckers and small carriers many of which, are dues paying members of the SBTC, the SBTC hereby DEMANDS that TQL IMMEDIATELY CEASE AND DESIST from continuing to engage in this unlawful practice of requiring carriers waive their regulatory rights to rate transparency under 49 CFR 371.3 as a condition to receive loads from TQL and immediately advise the SBTC in writing no later than May 15, 2023 that it has terminated what we believe is this unlawful and abusive practice so that we may know how to proceed.

Thank you for your anticipated cooperation.

Sincerely,

Laurence Socci, Esq.

cc: Larry Minning, tol gov

16



**EXHIBIT**

**U.S. Department
of Transportation**

Office of the Administrator

1200 New Jersey Ave, SE
Washington, DC 20590

**Federal Motor Carrier
Safety Administration**

March 1, 2022

Mr. James Lamb
Executive Director
Small Business in Transportation Coalition, Inc.
1775 I (Eye) Street, NW Suite 1150
Washington, DC 20006

Dear Mr. Lamb:

Thank you for your letter dated August 1, 2021, to the Department of Transportation's (DOT) Office of General Counsel on behalf of the Small Business in Transportation Coalition (SBTC). In the letter, SBTC requests "retrospective review" of 49 CFR Part 371 and further requests guidance related to broker transparency.[1] Your letter was forwarded to the Federal Motor Carrier Safety Administration (FMCSA) for response.

The substance of SBTC's August 1, 2021, request for "retrospective review" relates to the same broker transparency issues identified by SBTC in its May 6, 2020, petition for rulemaking. Accordingly, SBTC's 2021 request is duplicative of SBTC's 2020 rulemaking petition. FMCSA therefore denies SBTC's August 2021 request for retrospective review. FMCSA will, however, file your request for retrospective review in the existing rulemaking docket for SBTC's May 2020 petition for rulemaking (Docket No. FMCSA-2020-0150).

As to your request for guidance on compliance with Part 371 during the pendency of the related rulemaking petitions filed by SBTC, the Owner-Operator Independent Drivers Association (OOIDA), and the Transportation Intermediaries Association (TIA), all brokers remain subject to any requirements that are applicable to them. As to your request for guidance "on how motor carriers and independent truckers should handle situations in which they are told they may not have loads if the[y] choose to exercise their right to broker transparency," FMCSA will consider this request in connection with SBTC's May 2020 petition for rulemaking.

---

[1] SBTC submitted its retrospective review request under DOT regulations contained in 49 CFR 5.13, which were rescinded effective May 3, 2021. *See* 86 F.R. 17292, 17293 (Apr. 2, 2021). Specifically, former 49 CFR 5.13(c) provided that a person could petition a DOT operating administration (OA), such as FMCSA, or an OST component with rulemaking authority to perform a retrospective review of an existing rule of the OA or OST component. In the Final Rule rescinding section 5.13 and revising DOT's regulations on rulemaking procedures, DOT explained that while it was revising the petition procedures and removing the specific reference to retrospective reviews, it would nevertheless accept and process these types of petitions under an expansive definition of "rule."

2

If you need additional information or assistance, please contact Mr. Earl Adams, FMCSA Chief Counsel, at (202) 366-2866 or earl.adams@dot.gov.

Sincerely,

*Robin Hutcheson*

Robin Hutcheson
Acting Administrator

**EXHIBIT**

D

| From: | Newcomb, Nelson (FMCSA) |
|---|---|
| To: | Amy Unger |
| Subject: | RE: National Consumer Complaint Database (NCCDB) - Broker Complaint # 100245033 |
| Date: | Thursday, November 30, 2023 12:16:00 PM |
| Attachments: | image002.png |

Hello,

Thank you for the information.

Please ensure compliance with the Federal Motor Carrier Regulations and follow the below guidance and regulations. If you have any questions please feel free to contact me.

- **Remove the following language from any and all Broker/Carrier Agreements which is located on page 4 of the submitted agreement with Pink Cheetah Express, LLC. Language as stated below may be a violation of § 14906:**

  "BROKER is not required to disclose its charges to CUSTOMERS, commissions, or brokerage revenue, and CARRIER waives its right to receive, audit, and/or review information and documents to be kept as provided in 49 C.F.R. § 371.3."

- **Ensure compliance with the following regulation and provide transaction records to any carrier when requested.**

  **§ 371.3 Records to be kept by brokers.**
  (a) A broker shall keep a record of each transaction. For purposes of this section, brokers may keep master lists of consignors and the address and registration number of the carrier, rather than repeating this information for each transaction. The record shall show:
  (1) The name and address of the consignor;
  (2) The name, address, and registration number of the originating motor carrier;
  (3) The bill of lading or freight bill number;
  (4) The amount of compensation received by the broker for the brokerage service performed and the name of the payer;
  (5) A description of any non-brokerage service performed in connection with each shipment or other activity, the amount of compensation received for the service, and the name of the payer; and
  (6) The amount of any freight charges collected by the broker and the date of payment to the carrier.
  (b) Brokers shall keep the records required by this section for a period of three years.
  **(c) Each party to a brokered transaction has the right to review the record of the transaction required to be kept by these rules.**

**Nelson Newcomb,** Transportation Specialist
*Commercial Enforcement Division*
*Office of Safety*
Federal Motor Carrier Safety Administration
1200 New Jersey Avenue, SE | Washington, DC 20590

## CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Pink Cheetah Express, LLC<br>1775 I. Street, NW Ste. 1150<br>Washington, DC 20006 | Total Quality Logistics, LLC<br>4289 Ivy Point Blvd.<br>Cincinnati, OH 20590    _28888_ |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Laurence L. Socci, Esq.
The Socci Law Firm
P.O. Box 14051
Washington, DC 20044

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government
    Plaintiff

◉ 3 Federal Question
    (U.S. Government Not a Party)

○ 2 U.S. Government
    Defendant

○ 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical
    Personal Injury Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If
    Administrative Agency is
    Involved)

**◉ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**          OR          **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property
    Damage
☐ 385 Property Damage
    Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions
    of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New
    Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of
    2016 (DTSA)

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant)
☐ 871 IRS-Third Party 26 USC
    7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of
    Property 21 USC 881
☐ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC
    3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 462 Naturalization
    Application

☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced
    & Corrupt Organization
☐ 480 Consumer Credit
☐ 485 Telephone Consumer
    Protection Act (TCPA)
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/
    Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure
    Act/Review or Appeal of
    Agency Decision
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions
    (if not administrative agency
    review or Privacy Act)

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/Privacy Act** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge  ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 U.S.C. 2201 and 49 U.S.C. Sec. 14704 - Plaintiff seeks declatory and injunctive relief relating to a federal question.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | | **JURY DEMAND:** | Check YES only if demanded in complaint  YES ☐  NO ☒ |
|---|---|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form

DATE: 2-24-25   SIGNATURE OF ATTORNEY OF RECORD _Jammy Sun_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.    CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Pink Cheetah Express, LLC<br>1775 I. St. NW Ste. 1150<br>Washington, DC 20006<br><br>_____<br>*Plaintiff(s)*<br>v.<br>Total Quality Logistics, LLC<br>4289 Ivy Point Blvd.<br>Cincinnati, OH 20590<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Total Quality Logistics, LLC
4289 Ivy Point Blvd.
Cincinnati, OH 20590

Serve: Shawn Coulson, LLP
1320 19th St., NW Suite 601
Washington, DC 20036

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Laurence L. Socci
The Socci Law Firm
P.O. Box 14051
Washington, DC 20044

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                         *Server's signature*

                                                _____
                                                         *Printed name and title*

                                                _____
                                                         *Server's address*

Additional information regarding attempted service, etc: